**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

**No. 70–347.**

United States District Court,
E. D. Pennsylvania.

March 6, 1973.

## MEMORANDUM AND ORDER NO. 1137

FULLAM, District Judge.

The Trustees' reports of January 1, 1973 and February 1, 1973, and certain other recent developments, make it necessary for the Court to reevaluate the status of this reorganization, with a view toward charting a future course for the reorganization proceeding which will be consistent with legal and constitutional requirements.

From the very beginning of the reorganization proceeding, it had been apparent that a successful private income-based reorganization of the Debtor would be feasible if certain specified conditions, largely beyond the control of the Trustees, the parties, or this Court, could be met. In general terms, these conditions are: increase in freight business and revenues, rationalization of physical plant, elimination of unnecessary labor costs, and elimination of losses on passenger service.

Under the timetable heretofore established, it was contemplated that, by April 1, 1973, all of these objectives would have been accomplished, or substantially in the process of accomplishment, so that a definitive plan of reorganization could be filed by that date. The plan previously outlined by the Trustees contemplates that realization of these objectives, or "conditions to viability," would have been sufficiently assured by that date to permit a rational forecast that their benefits would accrue in such fashion as to permit consummation of a private income-based reorganization by 1976.

It is now clear, however, that these goals have not been, and cannot be, sufficiently accomplished to permit the filing of a definitive plan on April 1, 1973.

Moreover, the recent reports of the Trustees point up an additional factor: the condition of the Debtor's physical plant is such that substantial additional capital investment would be required in order to provide adequately the increased service projected.

The immediate issue before the Court, therefore, is whether the April 1 deadline should be extended. The public interest undoubtedly requires that the Debtor's rail service be continued beyond that date; but the Constitution prohibits sacrificing the property rights of creditors to that public interest without just compensation.

There are three principal lines of inquiry which must be explored: (1) Has the continued operation of the Debtor during reorganization so depleted its assets that, if the Debtor were liquidated, the assets would be insufficient to pay pre-bankruptcy secured debt? (2) Is there a realistic prospect that the Debtor can become profitable enough, promptly enough, to be reorganized? (3) Can an adequate cash-flow be maintained to support continued operations during reorganization? All of these issues are inter-related, and each involves its own variables.

1. *Erosion.* While the precise calculations have not been fully developed, the record justifies the conclusion that post-reorganization deferrals and unpaid administration claims have already eroded the Debtor's estate to the extent of about $500 million. Whether the constitutional limit has been exceeded depends primarily upon how the remaining assets are to be valued; and this in turn may well depend upon how those assets are to be used at the conclusion of this reorganization. Under any view of the matter, it seems clear that the point of unconstitutionality is fast approaching, if it has not already arrived.

2. *Prospect of profitability.* The reorganization planning to date has been based upon the premise that the Debtor

could be converted from an over-sized, low-density railroad with many unnecessary employees to a more compact, high-density railroad operating with shorter crews, and that the benefits of these changes could be realized in time to produce adequate profits by 1976. It has also been contemplated that, if service essential to the public must be continued at a loss, the losses would be reimbursed from some external source.

The original projections were that income available to pay fixed charges at the level of $275 to $290 million would be adequate, and could be achieved by 1976. Later projections have made it appear that a level of approximately $243 million would be more realistic, and would probably be adequate. All of these figures assume that revenue increases, through a combination of increased tariffs and increased volume, would offset the effects of inflation upon operating costs.

■ The essence of § 77 of the Bankruptcy Act is that the legal remedies normally available to creditors may be held in suspension for a reasonable time in order to permit rehabilitation of the enterprise. Whenever it appears that there is no genuine likelihood of ultimate success, the legal and constitutional justification for restraining creditors from exercising their normal remedies disappears. I am not prepared to hold that there is now no reasonable likelihood of viability. But, without minimizing the substantial progress which has been made to date, it is apparent that the required profitability cannot be achieved unless substantial further progress is made in the immediate future to meet the conditions upon which the projected profitability is based.

3. *Cash flow.* The Trustees have been able to continue rail operations to date without actually running out of cash. In substantial part, this has been made possible by borrowing $100 million on government guaranteed trustees' certificates. But in part, this has also been accomplished, to an extent not precisely determinable from the record, by deferring desirable capital expenditures, and by reducing maintenance and clerical expenses to a level which, in the long run, is probably unacceptable. The enterprise weathered a severe cash crisis within the past month (partly through the cooperation of organized labor in not opposing deferral of certain wage increases); another potential cash crisis looms ahead, in July and August of this year. Continued operation of the railroad during reorganization would have been utterly impossible except by deferring payment of real estate taxes and leased line rentals. It seems clear that, in the absence of substantial improvement, the Debtor cannot continue indefinitely on the present basis without running out of cash; and that, in any event, such items as taxes and rentals, and other legitimate expenses of doing business, cannot simply be deferred indefinitely.

It has long been apparent that the particular problems of Penn Central cannot be completely divorced from problems of national transportation policy. Railroads are, after all, a regulated industry. However unappealing may be the notion that a regulated industry can become bankrupt, the Trustees' efforts to rehabilitate the Debtor are circumscribed by existing statutes and regulations. To the extent that these statutes and regulations, whether in the area of abandonment, tariffs, or resolution of labor disputes, preclude the exercise of self-help in achieving profitability, the legislative and executive branches of government must be looked to for solutions, if solutions are to be forthcoming.

■ And this is as it should be, for it is those branches of government which should determine whether the kind of railroad which could emerge from a private income-based reorganization would be consistent with long-range goals of national transportation policy.

**1346**

Such matters as how much rail transportation should be provided, how much competition among railroads is desirable in the Northeast, and the extent of public interest in maintaining rail service which cannot be operated profitably, are clearly beyond the province of the Trustees, the other parties to this reorganization, and this Court.

I take judicial notice of the fact that the legislative and executive branches are now addressing themselves to these problems. By joint resolution adopted February 8 and approved by the President on February 9, 1973, Congress has called for recommendations from the appropriate departments, to be followed presumably by Congressional action on a comprehensive scale in the near future. And the Interstate Commerce Commission has initiated a proceeding, Ex Parte 293, dealing with these problems. It would obviously be premature, therefore, for this Court to make final determinations as to the future course of this reorganization proceeding on the basis of the existing legislative and regulatory framework. The legal and constitutional rights of the parties to this reorganization should be evaluated in the light of whatever changes Congress sees fit to enact.

By the same token, however, this Court cannot ignore the realities of the Debtor's situation. On the basis of the record to date, it appears highly doubtful that the Debtor could properly be permitted to continue to operate on its present basis beyond October 1, 1973.

 Under the circumstances, I have concluded that the April 1 deadline should be extended, but that a further hearing should be held on July 2, 1973, to permit a careful and realistic re-evaluation of the situation in the light of intervening events. At that hearing, the Trustees will be required to file either a feasible plan for reorganization of the Debtor, or their proposals for liquidation or other disposition of the enterprise.