In the matter of **PENN CENTRAL TRANSPORTATION COMPANY,** Debtor.

No. 70–347.

United States District Court, E. D. Pennsylvania.

March 1, 1974.

Reconsideration Denied March 19, 1974.

**186**

———◆———

Robert W. Blanchette, James E. Howard, John F. De Podesta, and Carl Helmetag, Jr., Philadelphia, Pa., for the Trustees, PCTC.

Covington & Burling by Charles A. Horsky, Washington, D. C., Special Counsel to the Trustees, PCTC.

Sullivan & Worcester by Joseph Auerbach, Boston, Mass., and Gratz, Tate, Spiegel, Ervin & Ruthrauff by Spencer Ervin, Jr., Philadelphia, Pa., for Richard Joyce Smith, Trustee, New York, New Haven & Hartford RR.

White & Case by Barry S. Greene, New York City, for Bankers Trust Co., as indenture trustee.

Kelley, Drye, Warren, Clark, Carr & Ellis by Edward Roberts, III, New York City, for Manufacturers Hanover Trust Co. and certain other indenture trustees.

Fox, Rothschild, O'Brien & Frankel by Nochem S. Winnet, Philadelphia, Pa., for First National City Bank of New York.

Willkie, Farr & Gallagher by Walter H. Brown, Jr., and Louis A. Craco, New York City, for Institutional Investors Penn Central Group.

Ballard, Spahr, Andrews & Ingersoll by Frederic L. Ballard, and Alan S. Fellheimer, Philadelphia, Pa., for Girard Trust Bank, indenture trustee.

Clark, Ladner, Fortenbaugh & Young by W. Charles Hogg, Jr., and Edward C. Toole, Jr., Philadelphia, Pa., for Committee of Interline Railroads.

James F. Dausch, Dept. of Justice, for the U. S. Government.

Rodney E. Eyster, Gen. Counsel for the Dept. of Transportation.

## MEMORANDUM IN SUPPORT OF ORDER No. 1480

FULLAM, District Judge.

█ Faced with the immediate prospect of exhaustion of available cash, the Trustees seek approval of an emergency arrangement with the Secretary of the United States Department of Transportation whereby the Secretary will make available approximately $10.8 million in order to prevent the occurrence of defaults by the Trustees in connection with certain equipment obligations.

Section 213 of the Regional Rail Reorganization Act of 1973 (P.L. 93–236) authorizes the Secretary to expend up to $85 million for the purpose of enabling railroads in reorganization to continue to provide essential rail services pending completion of the process contemplated by that statute; of this sum, $35 million has actually been appropriated. Section 215 of the Act authorizes the advance of up to $150 million for the purpose of interim acquisition, maintenance and improvement of rail assets which would eventually be conveyed to the new operating corporation contemplated by the statute, as part of the final system plan (increases in value resulting from such expenditures are not to be reflected in the consideration to be paid for such transfers, and the obligation to repay is to be assumed by the new corporation).

The Secretary has thus far declined to approve any grants under § 213, and is not yet in a position to implement § 215. To meet the present emergency, the Secretary is apparently willing to use § 213 funds, but not on a grant basis. The proposal contemplates that, instead of providing funds to the Trustees to meet operating expenses, the Secretary will, in effect, transfer funds equal to certain current installments due on equipment, and in return acquire a *pro tanto* interest in the Trustees' equity in that equipment. Meanwhile, it is contemplated that the parties will attempt to determine the extent to which § 215 funds can appropriately be made available to relieve future cash shortages.

A hearing on the Trustees' petition was held on February 26, 1974. The creditor interests all expressed, in varying degrees, their conviction that the proposed financing was contrary to the intent of the Regional Rail Reorganization Act of 1973, and also would violate the constitutional rights of the creditors. The New Haven Trustee flatly opposes the transaction. Substantially all of the other creditor interests, and the Trustees, expressed their willingness to have the Court approve the transaction, so long as it was clearly understood that this would not create a precedent for similar approvals in the future, and that all parties expressly reserved their rights to press all constitutional and legal arguments at the forthcoming hearings on the issues involved in § 207 of the Reorganization Act and in all other proceedings involving their rights under, and the constitutionality of, the statute.

As all parties recognize, unless these funds are provided immediately, the Trustees will be forced to default in the payments due on equipment in which they have an equity in excess of $70 million. Section 77(j) of the Bankruptcy Act severely restricts the power of a reorganization court to preclude equipment creditors from exercising the rights granted under the financing documents. No other source of cash to meet these installments has been suggested (and it is difficult to imagine any alternative source which would not involve repayment, and thus the same constitutional issues as in the present proceeding).

In short, if the creditors are correct in asserting that the obligations undertaken by the Trustees in connection with this transaction constitute an unconstitutional erosion of the Debtor's estate and the interests of its creditors, it nevertheless appears that vindication of that position must take place after the event, rather than before; otherwise, the Debtor's estate and the interests of the creditors would necessarily suffer an even greater erosion, through loss of the equipment.

I do not wish to pre-judge the constitutional and other issues which will be fully briefed and presented in connection with the § 207 proceedings and in other pending litigation. But it is appropriate to point out, again, that there are constitutional limits upon the extent to which erosion of the Debtor's estate may be permitted to continue. The underlying problems were discussed by this Court as long ago as July 14, 1972 (Opinion in support of Order No. 830), 347 F.Supp. 1356 (E.D.Pa.1972). One year ago, on March 6, 1973, I noted the probability that "the point of unconstitutionality is fast approaching, if it has not already been reached," and expressed grave doubt that the Debtor's rail operations could constitutionally be permitted to continue beyond October 1, 1973. Memorandum and Order No. 1137, 355 F.Supp. 1343 (E.D.Pa.1973). The erosion issues were throughly aired before the Interstate Commerce Commission during the summer of 1973, and were a constant subject of discussion in the legislative proceedings which produced the Regional Rail Reorganization Act of 1973. And the recent Opinion of the Third Circuit Court of Appeals in the "Columbus Option" case, In re Penn Central Transportation Co., 494 F.2d 270. (3d Cir. 1974), discusses some of these issues, forcefully. See, also, In the Matter of Central Railroad Co. of N. J., 485 F.2d 208 (3d Cir. 1973). In light of this history, and the expressed desire of the New Haven Trustee to proceed with the dismissal petition filed last November, it seems appropriate to suggest that the parties would do well not to assume that future cash crises can be met on any basis involving eventual reimbursement by the Debtor's estate, or that present cash flow forecasts will necessarily remain unaffected by interim developments.

This transaction will be approved. There is no alternative.

■ At the hearing, the Trustees submitted a proposed form of order, and the other parties expressed their views with respect to certain provisions thereof. It was agreed that the words "to

any other party" should be inserted after the word "transferred" in the second sentence of paragraph 1(d) of the order; that change will be incorporated. Paragraph 1(f) of the order governs the right of the Secretary to make further payments on the equipment in question, in the event the Trustees advise him that they are unable to do so, on the same basis as that contemplated by the present transaction. The Trustees propose to make that right "subject to further Court approval after hearing duly noticed," whereas the government objects to inclusion of that condition. I do not believe it would be legally permissible for a reorganization court to grant present authorization broad enough to encompass the future creation of further indebtedness, indefinite as to amount, in the discretion of third parties. While I am confident that this was not the intention, the form of order sought by the government might enable the Secretary to insure that, contrary to the present understanding of all concerned, this transaction would indeed establish a pattern for resolving at least some cash crises which might arise in the future. I have concluded that the Trustees' form of order is preferable.

Counsel for certain indenture trustees initially suggested a possible ambiguity in the language of paragraph 2(d) of the order. I do not believe any change is required. The reservation is framed in the broadest of terms and the interpretation spread upon the record by the indenture trustees is undoubtedly correct.

For all of the foregoing reasons, I have entered an Order (No. 1480) approving the Trustees' petition (Document No. 7024).

## ORDER NO. 1480

And now, this 1st day of March, 1974, upon consideration of the "Petition Of The Trustees For Approval Of The Terms Of, And Authority To Enter Into, An Agreement With The Secretary Of The Department Of Transportation With Respect To Certain Equipment Obligations" (Document No. 7024), and after a duly noticed hearing thereon, this Court FINDS that implementation of the terms of the agreement hereinafter set forth is in the best interest of the Debtor's estate; it is therefore ordered that:

1. Subject to the provisions of paragraph 2, *infra*, the Trustees are authorized to carry out the following agreement with the Secretary of the Department of Transportation (Secretary), the terms of which are hereby approved:

(a) The Secretary will pay directly to the obligees principal and/or interest on the installments due on the conditional sales agreements and equipment trust certificates falling due on February 15 and March 1, 1974, in a total amount of approximately $10.8 million. Approximately $1.2 million of this amount is subject to verification by the Secretary as of the date of this Order. The debt of the estate in respect of these installments on the equipment covered by said conditional sales agreements and equipment trust certificates shall, however, not be extinguished but shall be due to the United States, which will stand in the same position with respect to the obligor and with the same rights as the original obligee prior to the payment of the installments; *provided, however,* that the interests thus acquired by the Secretary are to be subordinated to the interests of the several obligees holding the conditional sales agreements and equipment trust certificates both with respect to right of payment of future installments, interest or maturities and rights in or to the underlying equipment in such manner as fully to protect the interests of the original lenders.

(b) The payments due on February 15 have been extended by taking advantage of grace periods, but to the extent that any payment must be made to avoid default prior to the time of the final determination granting the Trustees authority to enter into this arrangement, the amounts due the lenders may be paid by the Secretary in return for the indebtedness held by the obligees. In the

event the transaction is not authorized by this Court or by an appellate court on review of this Court's decision approving the transaction, the interest in the debts which are owned by the United States will be subject to the further order of this Court.

(c) So long as the Trustees are in possession of said equipment and are not in default on future debt installments related thereto, including any due by reason of acceleration, they shall not be required to pay that portion of the debt due to the United States. The Trustees may, however, at any time pay to the United States any amount which it has paid and in such event, the United States shall have no further interest in the equipment.

(d) The Trustees agree that they will transfer the equipment to Consolidated Rail Corporation if such a transfer is provided for in the final system plan; *provided, however*, that if the Debtor's rail estate is not reorganized pursuant to a final system plan under the Regional Rail Reorganization Act of 1973 (P.L. 93–236) (Act), the terms of the transfer shall be subject to the approval of this Court. If the Trustees' equity in said equipment is transferred, to any other party the debt installment held by the Secretary shall be satisfied by the Trustees' exercise of the option described in subparagraph (c) above on their part, or by the receipt from the transferee of consideration satisfactory to the Secretary.

(e) In the event the amount paid by the United States is not paid to it by the Trustees as provided in subparagraph (c) above, the United States shall have, either upon default by the Trustees in respect to future payments on said equipment, or at the expiration of the term of the obligation, such rights in said equipment, subject to any prior rights of the original equipment obligees, as are provided in the original equipment obligation and are enumerated in Section 77(j) of the Bankruptcy Act.

(f) The Secretary shall have the right, subject to further Court approval after hearing duly noticed, to make similar payments on said equipment in the event the Trustees advise him of their inability to service the debt. The Secretary's rights upon such payments will be the same as those stated herein with respect to the present payments.

(g) The Trustees will sustain rail freight operations at the level of January 2, 1974, subject to the availability of internally generated cash and to other unforeseen circumstances beyond their control. It is understood that the Trustees forecast a cash deficit in August, 1974.

(h) On or before May 15, 1974, the Trustees will submit to the Federal Rail Administrator a program contemplating the acquisition, maintenance or improvement of railroad equipment and facilities which could be made pursuant to Section 215 of the Act. The submission shall include the estimated return on investment of the improvements and the extent to which the program would contribute to improving the cash flow of the railroad, particularly the forecasted August cash deficit.

2. The aforesaid agreement is subject to the following conditions and clarifications:

(a) Implementation of this agreement by the Trustees shall not in any way affect their unfettered right to take whatever positions may be appropriate before this Court or the special court created pursuant to Section 209(b) of the Act with respect to the determinations provided for in Section 207(b) of the Act, or in any other proceedings.

(b) This Court is not foreclosing itself from hearing any issues that may be presented to it pursuant to Order No. 1426 herein, including issues with respect to the constitutionality of the Act, nor from making any decisions with respect to such issues, including the decisions under Section 207(b) of that Act.

(c) Approval and implementation of the agreement shall not create a

precedent with respect to any further financial assistance under the Act or a commitment with respect to the ultimate reorganization of the estate.

(d) This Order is without prejudice to the right of any party to assert any alleged constitutional right and this Court retains jurisdiction to enter such further orders, upon motion of any party or upon its own motion, as may be appropriate under Section 77 of the Bankruptcy Act or under the Constitution or otherwise.

(e) The obligation to be undertaken by the Trustees under paragraph 1(h) of this Order does not constitute a commitment on their part to enter into an agreement under Section 215 of the Act, and no such agreement will be entered into without the express approval of this Court after a hearing *de novo* on all relevant issues.

3. The Trustees are authorized to take any action necessary and appropriate to implement and to consummate the agreement.

4. This Court reserves jurisdiction over the subject matter of the agreement and its implementation.

### MEMORANDUM AND ORDER NO. 1509

Certain Indenture Trustees (the Bank of New York, Bankers Trust Company, the Fidelity Bank, and Manufacturers Hanover Trust Company) have filed a motion (Document No. 7158) for reconsideration of Order No. 1480 in these proceedings.

The Indenture Trustees correctly point out that the Memorandum of this Court, accompanying Order No. 1480, does not fully and accurately reflect the position taken by the Indenture Trustees at the hearing which resulted in that Order. The Indenture Trustees' willingness to permit the transaction to go forward was expressly conditioned upon certain modifications in the terms of the Order approving the transaction; and these modifications were not incorporated. These two conditions were as follows:

1. Requiring a commitment by the Trustees of the Debtor to repay the sums advanced by the government on or before June 15, 1974. As matters now stand, the Trustees have the option to do this, and, if appropriate, might still be ordered by this Court to do so; but this is not necessarily going to happen.

2. That the determination of the precise nature of the government's claim for repayment of the sums advanced be left open since, if the condition discussed above were imposed, those issues would become moot by June 15, 1974. To adopt this approach would, in my view, have been tantamount to rejecting the proposal outright, since the government was unwilling to put up any money on that basis.

The Indenture Trustees assert that the $10.8 million transaction approved by Order No. 1480 will produce results violative of the constitutional rights of the secured creditors, among others; that the Regional Rail Reorganization Act, properly construed, would enable the Secretary of Transportation to obviate at least this particular instance of unconstitutionality by making a § 213 grant, rather than a quasi-loan; and that, by requiring the Trustees to repay the $10.8 million as soon as cash permits, this Court could insure the restoration of the status quo, so that future reorganization decisions could be properly evaluated. There is much to be said for this approach, and, in my view, Order No. 1480 is not inconsistent with that result. But, for the reasons hereinafter set forth, I decline to make any change at this time in the provisions of Order No. 1480.

In the first place, the factual details in support of the contentions of the parties on the erosion issues have not been fully developed on the record in these proceedings. Presumably, these issues will be squarely presented in the forthcoming hearings under § 207 of the RRRA and the pending petitions for dismissal or cessation.

In the second place, a present directive to repay the money by June 15 could

be entered only on the assumption that cash flow projections compiled in February will prove to have been precisely accurate. In my judgment, the situation is entirely too fluid to permit any such assumption. And in this connection, it must be remembered that the Trustees retain the option to repay the $10.8 million at any time, *without interest*. Deferral of repayment until the necessity and desirability of repayment can be demonstrated with certainty appears to be the preferable course, since the Debtor's estate pays nothing for the use of the money.

For all of the foregoing reasons, the motion for reconsideration will be denied. However, this Memorandum will be spread upon the record as an addendum to the Memorandum in Support of Order No. 1480, for purposes of clarification.