In the Matter of **PENN CENTRAL TRANSPORTATION CO.,** Debtor.

In re **EQUIPMENT INSTALLMENTS.** No. 70-347.

United States District Court, E. D. Pennsylvania.

Oct. 8, 1975.

James E. Howard, Philadelphia, Pa., for Trustees, PCTC.

Sullivan & Worcester by Morris Raker, Boston, Mass., and Gratz, Tate, Spiegel, Ervin & Ruthrauff, by Spencer Ervin, Jr., Philadelphia, Pa., for Richard Joyce Smith, Trustee, New York, New Haven & Hartford RR Co.

James F. Dausch, Washington, D. C., for U. S. Dept. of Justice.

Jerome Sharfman, Washington, D. C., for U. S. Dept. of Transportation.

Rosenman, Colin, Kaye, Petschek, Freund & Emil by Ambrose Doskow, and William W. Golub, New York City, for First National City Bank of New York.

Ballard, Spahr, Andrews & Ingersoll, by Richardson Blair, Philadelphia, Pa., for Institutional Investors and Indenture Trustees on Schedule A.

Michael T. Haley, Washington, D. C., for Federal Railroad Administration.

## MEMORANDUM AND ORDER NO. 2037

FULLAM, District Judge.

The Government has applied for further relief in its continuing efforts to acquire interests in equipment obligations covering some of the Debtor's rolling stock, as a means of providing cash to support interim operation of the railroad through the use of funds obtained pursuant to § 215 of the Regional Rail Reorganization Act of 1973 (hereinafter RRRA).

The specific issue presented is whether it is legally permissible and appropriate for this Court to require the present holders of equipment obligations to assign a subordinated *pro rata* interest therein to the Government in exchange for payment by the Government of certain interest installments, notwithstanding the holders' unwillingness to make such assignments, and notwithstanding the protections accorded equipment obligations pursuant to § 77(j) of the Bankruptcy Act and §§ 211 and 303(b) (3) of the RRRA. But because of the relationship between this specific issue and the issues heretofore determined in Orders Nos. 1884 and 1971, and because counsel for the Government in the present proceeding have to a large extent reargued those earlier issues, and have asserted, in effect, that this Court's earlier decisions on this subject were based upon a misunderstanding of the Government's true position, and an erroneous view of the legal consequences which would flow from implementation of the Government's proposals, discussion of the specific issue now before the Court properly begins with a recapitulation of the earlier proceedings, and a brief sketch of the relevant context.

1. *Interim funding under RRRA as originally enacted.*

In the original enactment of the RRRA, Congress appropriated funds for use by the Secretary of Transportation to make cash grants to the bankrupt railroads to enable them to meet operating expenses, pending implementation of the Final System Plan pursuant to the statute (§ 213). Congress also authorized the United States Railway Association (USRA) to raise additional funds through securities guaranteed by the United States Government, for use in upgrading and improving the rail properties which would ultimately be included in the Final System Plan. (§ 215) Under § 213, the Government was to provide cash to the railroads as necessary in order to enable them to remain in operation at existing levels of service. Under § 215, USRA was enabled to commence the process of upgrading the physical rail plant which would be taken over by Conrail, without awaiting the final determination of the ultimate structure of the rail network or the actual creation of Conrail. While it is true that the grants under § 213 were to be made upon such reasonable conditions as the Secretary

might prescribe, it is altogether too clear for argument that Congress contemplated grants, not loans. On the other hand, § 215 funds were to be used in the form of loans to Conrail in advance of its formation.

The differing provisions of §§ 213 and 215 were not accidental, but reflected Congress' awareness of the delicate balance between the public and private interests involved, and the attendant constitutional issues which then loomed large in the minds of all concerned. For it must be remembered that the RRRA governed only those bankrupt railroads which had been conclusively determined to be incapable of reorganization on an income basis and thus, under familiar constitutional principles, presumably entitled to terminate their common carrier responsibilities and dispose of their properties, but for the alternative course of action mandated in the RRRA.

### 2. The 1975 amendments to the RRRA.

The first year of operations under the RRRA brought to light several problems in the implementation of §§ 213 and 215 as written. The primary problem, of course, was that the total amount of the funding was clearly insufficient for the purposes intended. In addition, however, it had proved to be exceedingly difficult to implement § 215. In its existing form, § 215 required at least a preliminary judgment as to what properties would be included within the Final System Plan. Moreover, it proved difficult to draw a satisfactory line between expenditures which would upgrade the property and expenditures which would merely prevent further deterioration. A particular proposal would often include some elements of maintenance as well as improvement.

The 1975 amendments to the RRRA addressed both sets of problems. In addition to increasing the amount of funding under both § 213 and § 215, Congress expanded § 215 so as to make it possible for § 215 funds to be used in ways which would have a substantial positive impact upon the Debtor's cash flow. Under the original provisions of the Act, as noted above, § 215 funds were not available to alleviate cash flow problems, since they could be used only for expenditures which would not ordinarily have been made by the bankrupt estates. The amended § 215 now permits the use of these funds for "program maintenance" as well as for purchases of equipment and of interests in equipment obligations. To the extent that expenditures in these categories had been budgeted by a particular bankrupt railroad, or otherwise included in the base upon which the railroad's projected cash needs were calculated, the use of § 215 funds for those purposes can have the effect of supplementing § 213 funding in relieving cash drain and thus insuring continued operation of the railroads until the conveyance date.

■ But implementation of the Act as amended has given rise to complex and probably unforeseen problems. One facet of overall difficulty is the use of almost $30 million in § 213 funds for work in the Amtrak corridor. This action tends to reduce the grant funds available and thereby necessitates use of § 215 funds for high cash impact projects. Within the § 215 program the program maintenance and equipment obligations methods present distinct issues. Under a § 215 program maintenance agreement the value of the property subject to the agreement is determined as of the date of the agreement. Thus, the value of property is not increased by use of the Government's money. Even though the Government has not disclaimed an intention to argue that these § 215 funds must eventually be treated as "other benefits" which reduce the amount due the Trustees, a number of § 215 program maintenance agreements have been approved. However, the § 215 agreements covering equipment obligations are much different in that it is decidedly more likely these agreements will have essentially the same effect as the issuance of first priority trustees certificates. As previously discussed in my Opinions in Support of Orders Nos. 1884 and 1891, to

which further reference will hereinafter be made, I am persuaded that Congress did not intend to impose a requirement that the bankrupt railroads incur additional high-priority debt to meet interim operating expenses; and that imposition of any such requirement is inconsistent with the rationale employed by the Supreme Court in upholding the constitutional validity of the original statute. *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). Moreover, the determination as to whether a particular bankrupt railroad would receive grants to enable it to continue in operation until the conveyance date, or would be required to borrow money for that purpose, would be fortuitous rather than rational, since it would depend upon the amount of budgeted but unperformed routine maintenance included in its cash flow projections.

Finally, Conrail may be subject to serious adverse consequences from the use of § 215 funds to meet current expenses. Whereas it made sense to have the bankrupt estates act as vehicles by means of which USRA could lend money to Conrail in advance of its formation for the purpose of improving the rail properties to be conveyed, it arguably does not make sense thus indirectly to lend money to Conrail for the purpose of mere maintenance, particularly with respect to properties which may never be included in the Final System Plan. It is true that the authority granted by § 215(c) to permit forgiveness of some or all the § 215 obligations assumed by Conrail may be used to mitigate the adverse effect on Conrail. On the other hand, it is the failure to consider the similar problem which the Trustees face in these equipment obligation transactions that has generated the present litigation.

I hasten to emphasize my awareness of the fact that the matters of policy and problems of administration referred to are not assigned to this Court for resolution. They are mentioned here only for the light they may shed upon the true intent of Congress, a matter of statutory interpretation which is within the judicial province.

3. *History of the Government's equipment proposals.*

Included in all of the cash projections of the Debtor, inevitably, are expenditures to meet installments on the purchase of rolling stock as they fall due. The Government has proposed to provide the funds to meet these payments, but under a three-way arrangement between the Debtor, the obligees, and the Government whereby such payments would not extinguish the debt, but the obligation to make such payments, both as to principal and interest, would remain. The obligees would assign to the Government, *pro tanto*, their claims against the Debtor's estate for such installments, but the Government's rights would be subordinated in all respect to the rights of the obligees. While the Debtor's estate would not be discharged from its obligation to make these installment payments, the obligation would not be enforced so long as the Debtor continued in possession of the equipment, and so long as no other default occurred. The Trustees would have the right to reimburse the Government and discharge the obligation *pro tanto* by repaying the amount involved, without interest, at any time up until the conveyance date. The precise legal consequences of the proposed arrangement will be discussed further below.

The Government first advanced a comparable proposal in the spring of 1974, using § 213 funds for that purpose. Strenuous objections were interposed by creditor interests. The Trustees, however, acquiesced in the Government's proposal, but with the distinct understanding, which was spread upon the record, that this would not be deemed to establish a precedent for similar transactions in the future. Since it appeared that, under the emergency cash shortage then prevailing, the transaction was absolutely necessary in order to prevent a much greater loss to the Debtor's estate

through the loss of the equipment, this Court approved the transaction, in Order No. 1480. *In re Penn Central Transportation Co.*, 373 F.Supp. 185 (E.D.Pa. 1974), appeal dismissed *In Re Penn Central Transportation Co.*, 508 F.2d 270 (3d Cir. 1975).

The particular equipment installments covered by Order No. 1480 were payable to First National City Bank (Citibank) as agent for groups of investors. The question of whether the transaction could be consummated without the consent of the investors did not arise in that proceeding, since the Government eventually succeeded in persuading the investors to agree. In the more recent hearings on this subject, the Court has been advised that the substantial legal fees of the non-government parties which were incurred in negotiating and consummating that transaction were borne by the Debtor's estate.

After the 1975 amendments to § 215 were enacted, the Government petitioned this Court to direct the implementation of a similar proposal with respect to equipment obligations falling due during the month of May 1975, with the announced intention of implementing similar transactions with respect to all equipment installments falling due between May 1, 1975, and March, 1976, totaling approximately $62 million. In Memorandum and Order No. 1884, I denied the Government's petition, holding that, insofar as a particular installment payment represented interest and depreciation, clearly chargeable to current operations, the Trustees could not lawfully, under § 77 of the Bankruptcy Act, incur additional indebtedness which would prime the rights of secured creditors, at least in the absence of a showing of necessity; and that the Government had failed to demonstrate that the expenses of current operations could not be met from other, permissible, sources. 395 F.Supp. 567. I suggested that the perceived legal impediment could readily be removed if the Trustees' obligation to repay were limited to that portion of each installment attributable to equity build-up, or if some equivalent arrangement were made.

The Government has appealed Order No. 1884, but in the meantime filed a further application covering installments falling due in August and September, and sought to remedy its earlier failure of proof by demonstrating that implementation of its proposal was necessary to insure both the continued operation of the Debtor's railroad, and the operation of the other bankrupt railroads, until the conveyance date. In Memorandum and Order No. 1981, I expressed the view that the Government had not succeeded in demonstrating the necessity or legal propriety of its proposals, but that the Trustees would be directed to comply with the Government's proposals on a temporary basis, so as to provide an opportunity for re-evaluation of the situation in the light of succeeding events. The Government had contended that the Trustees' cash flow projections were unduly optimistic, while the Trustees and creditors argued that the Government had seriously overstated the future cash needs; and none of the parties had taken into account the effects of a proposed rate increase which was then pending and which, if approved, might become effective in October. By directing the Trustees to permit the Government to make the installment payments for August and September, and further directing the Trustees to repay these amounts not later than December 1, unless otherwise ordered in the interim, I reconfirmed the Court's position that the Government's approach should not be adopted unless necessary, but preserved the Government's proposals as a feasible alternative in the event the Government's earlier projections should prove accurate.

4. *Evolution of the Government's legal arguments.*

Throughout all of the proceedings recounted above, the basic legal premise asserted by the Government was that

the Trustees can properly be required to create new and additional kinds of deferred administration expenses in order to keep the railroad operating until the conveyance date. Since administration claims prime the claims of secured creditors, the Government's argument was that property securing the claims of secured creditors can properly be invaded for the purpose of meeting current operating expenses. The Trustees and the creditors argued that this is impermissible under § 77, and would be unconstitutional. The Government countered with the argument that the RRRA supersedes § 77 to this extent, and that claims for constitutional violations can be asserted under the Tucker Act, in accordance with the Supreme Court's decision in the *Regional Rail Reorganization Act Cases, supra.*

■■ The views of this Court, as set forth in support of Orders Nos. 1884 and 1981, may be summarized as follows: Under § 77 law, the interests of secured creditors may not be invaded for purposes of meeting current operating expenses except on the basis of a finding that the expenses of current operations could not otherwise be met; the RRRA supplants § 77 only to the extent that departure from § 77 principles is necessary to the implementation of the Final System Plan; and neither form of necessity had been shown in this case. I have not accepted in their entirety the arguments of any of the parties with respect to the intent of Congress on the subject of interim operations, as expressed in the RRRA.[1] The net effect of this Court's rulings has been a holding that, at the very least, Congress did not intend to require that interim operations be paid for in ways which will require later resort to the Tucker Act, unless all of the funds provided by Congress to support interim operations have first been exhausted.

The Government now argues that its proposals do not involve, and never have involved, any deferral of administration expenses, hence the interests of secured creditors are in no way adversely affected. Moreover, the Government asserts that this has always been its position in the matter—an assertion which is difficult to reconcile with the expenditure of effort by counsel in arguing the permissibility of such deferrals.

It is true that in an earlier post-hearing brief (Document No. 8874, at p. 6) counsel for the Government stated:

> "The proposed agreement does not require the Trustees to repay the equipment obligation held by the Government so long as the Trustees are in possession of the equipment. If the equipment is transferred to Consolidated Rail Corporation under the Final System Plan, the obligation acquired by the Government will likewise be transferred to Conrail. § 303 (b)(3)."

But this has now been expanded to the statement at the recent hearing (Tr. p. 14,745): "There will be no permanent deferral of administration expenses as a result of this agreement." If it were possible to conclude that the Government's proposal would relieve the Debtor's estate of any further liability to anyone for the obligation represented by the installments paid by the Government, the Government's proposal would indeed stand in a very different light. But neither the proposed agreement nor the present argument of Government counsel provides assurance of that happy result.

Everyone agrees that implementation of the Government's proposal would have the following consequences: USRA would pay the particular installment to the equipment creditor. The obligation for the installment would not be extinguished, but the equipment creditor

---

1. The Government in essence argued that the Congressional objective, continuation of rail operation, should be achieved without regard to increase in the already massive amount of accrued administration expenses, and creditors argued that under no circumstance could additional priority debt be incurred.

would assign to USRA, *pro tanto*, its rights to recover that installment from the Debtor. Pending conveyance of the equipment to Conrail, USRA would be precluded from exercising any rights against the equipment in the absence of some other default; but upon conveyance, the prohibition against enforcement by USRA terminates. Upon conveyance of the equipment to Conrail, under § 303(b)(3) of the RRRA, Conrail would assume all outstanding equipment obligations, including the interests acquired by USRA as aforesaid.

Thus, under the terms of the proposed financing agreements, the Debtor's obligations with respect to the installments in question would be reactivated upon conveyance, but under § 303(b)(3) that same obligation would also be assumed by Conrail.

According to the Government's view, one or more of the following consequences would then eventuate:

1. The Special Court would be required to fix the value of the ownership of the equipment conveyed to Conrail. The Trustees would be free to argue to the Special Court that under the RRRA or general equitable principles, the obligation still owing to USRA for installments should be disregarded. On the other hand, USRA and Conrail would be free to argue to the contrary.

2. If the Trustees do not succeed on the valuation question, they would be

free to argue that charging the Debtor's estate with the amount of the obligation to USRA (*i. e.*, actual deferral of operating expenses) is unconstitutional and therefore compensable under the Tucker Act.

3. Alternatively, it is possible that USRA will exercise its authority under § 215(c) of the RRRA to forgive Conrail's obligation to satisfy USRA's interest in the equipment. If the debt is forgiven to that extent, the Government would be free to argue that such forgiveness constitutes one of the "other benefits" which the Special Court should take into account in valuing what the estates receive; the Trustees would be free to argue to the contrary; and if the outcome violates the constitutional rights of anyone, the Tucker Act remains available.

It is thus clear that neither the earlier nor the more recent formulations of the Government's argument can be read to justify the assertion that this Court's concern with deferral of operating expenses missed the point. The fact is that implementation of the Government's equipment proposals would not discharge the underlying debt, and would not relieve the Debtor's estate of its obligations in that regard. The RRRA specifically does not address the issue of whether the "assumption" by Conrail of remaining equipment obligations would exonerate the estates of the Debtors from all further liability.[2]

---

2. Although reasonable arguments can be made that in the context of the entire Act and its legislative history the Debtor would be discharged on Conrail's assumption, the Government has not articulated any argument other than the bold conclusion that § 303(b) necessitates this result.

An analysis of the application of traditional suretyship principles to the equipment obligation transaction before the Court makes clear what the difficulties are. It should be noted that Conrail actually makes two kinds of assumptions. Under § 303(b)(2), Conrail assumes outstanding debt on equipment and under § 215(c) it assumes the obligation arising out of USRA's financing of the acquisition of the *pro tanto* portion of the debt. Section 215(c)'s authority to forgive Conrail's assumption is applicable only to the financing obligations. For present purposes

forgiveness of the financing obligation is treated as also operating to discharge Conrail's assumed obligation to satisfy USRA's debt interest in the equipment obligation.

Assume: A car with a fair market value of $100, $50 in outstanding debt due the original equipment creditors, and a $10 debt interest acquired by USRA. Conrail assumes the total of $60 debt (§ 303(b)(2)). Under suretyship principles the transferors, the Trustees, remain liable on the original obligation ($60) as a surety for the assuming transferee's payment.

Example 1: In the valuation process the Trustees get a $40 credit for the car. The $10 reduction to account for USRA's interest is equivalent to issuance of a $10 trustee certificate with first priority, even over administrative expenses. If Conrail defaults on some or all of the $60 obligation and

The difference in expression between the Government's analysis and this Court's discussion of the issues is largely semantic. I have used the term "deferral" to characterize instances in which non-payment of a current operating expense results in the accrual of an administration expense which primes secured creditors. It seems clear that in the absence of cancellation of the Debtor's obligation with respect to an installment payment, this obligation would remain, either as a general administration claim, or as a claim to be satisfied by subtraction from value when the equipment is sold. Indeed, in the latter case, the injury to the secured creditors would be more pronounced, since the entire burden would be borne by the particular secured interest, rather than allocated.

5. *Cost to the taxpayers.*

In its most recent brief in this Court, the Government argues that failure to approve its proposals is contrary to the requirements of the RRRA that the Final System Plan be formulated and carried out at the "least possible cost" to the federal treasury. While this argument was not advanced in the earlier hearings, counsel for the Government states that it forms a principal part of the Government's presentation on appeal from the earlier orders. The intent of Congress, expressed in the RRRA, to minimize the cost to the taxpayers is manifest. But since the ultimate justification for all of the Government's arguments is its theory that the Tucker Act remedy provides an unlimited credit card for the estate and its creditors, I fail to perceive how the congressional goal of frugality would be served by the Government's proposals.

Moreover, in evaluating these assertions, it is appropriate to bear in mind that the implementation of the RRRA has wrought substantial changes in counsel's perceptions of the role of the Government in this case. During the early phase of the reorganization proceedings, counsel for the Government were spokesmen for the public interest in continued rail transportation, and for the Government's interest as creditor of the estate. As implementation of the RRRA has proceeded, however, representation of the Government interests also encompasses representation of agencies and institutions with the assigned task of acquiring the great bulk of the Debtor's railroad at the lowest possible cost. There is nothing sinister or improper in this, of course. But it does point up the adversary nature of the relationship between counsel for the Government and counsel for the Trustees and the creditors. In the course of the Government's recent arguments, there have been occasional references to the desirability of "cooperation" between reorganization courts and the executive and legislative branches in effectuating the provisions of the RRRA. It is essential, however, for the reorganization court to avoid even the appearance of departure from the true judicial function for the purpose of advancing the cause of one set of adversaries at the expense of another.

the Trustees cure the default, they are entitled to exoneration from Conrail. Exoneration is a valuable right only to the extent that Conrail can satisfy the liability.

If Conrail's assumed $10 obligation is forgiven, as authorized by § 215(c), the Trustees as surety would ordinarily be discharged also. 2 Glenn, *Mortgage* § 280 (1943 ed.). But the Trustees' net consideration remains $40.

Example 2: In the valuation process the Trustees receive $50. If Conrail defaults on its $10 obligation and the Trustees pay it as surety, they have a right of exoneration against Conrail. Of course, if the $10 obligation is forgiven, then the Trustees would have the full $50. With respect to both possibilities it must be remembered that a $50 credit in the valuation process must be received. The Government has stated that this result can be argued for by the Trustees, but the Government may argue for a $40 credit. If there is no forgiveness of Conrail's $10 obligation, then on Conrail's default the Tucker Act comes into play. The same would be true if the Trustees paid as surety any portion of the $50 obligation to the original equipment creditors. But recourse to a Tucker Act remedy is precisely the issue previously addressed in Order No. 1884.

6. *Acquisition of interests in equipment obligations.*

The specific issues raised by the Government's application must now be addressed. Order No. 1981 directs the Trustees to enter into the financing arrangements proposed by the Government. While the Order contemplates that the arrangement will have a relatively brief existence, barring future changes in circumstances or modification of this Court's views on the underlying legal issues, the fact remains that, for present purposes, the Trustees' objections have been overruled and the Government's views prevail. But the present holders of certain equipment obligations are unwilling to participate in the arrangements proposed by the Government.

The particular conditional sales agreements now in question may, for convenience, be regarded as a single agreement, dated as of May 1, 1966, between the Debtor's predecessor and a group of investors represented by Citibank as agent. The agency agreement between the investors and Citibank requires Citibank to give prompt notice to the investors in the event of default, and thereafter to take such action as may be authorized by two-thirds vote of the investors. The agency agreement is silent on the subject of assignments, but the conditional sales agreement contemplates assignability of the interests of the holders.

Since Citibank was not empowered, as agent, to assign any part of the interests of the investors to the Government in exchange for the Government's payment of the particular installment under the conditional sales agreement, it was necessary for Citibank to attempt to obtain the consent of the investors for that step. When it became apparent that the grace period for the installment payment would expire before Citibank could obtain responses from its inquiries to the investors, an arrangement was worked out between the Government and Citibank whereby the Government would deposit the installment payment (approximately $1.1 million) with Citibank in escrow.

If all of the investors agreed to assign their interests to the Government, Citibank would distribute the $1.1 million to the investors. Unless all of the investors agreed, however, the money was to be repaid to the Government. Approximately 94% of the investors agreed to the Government's proposal, but a minority refused to consent.

By agreement between the Government and Citibank, the escrow arrangement has been extended pending resolution of these problems. In the meantime, Citibank has conditionally notified its investors of the "default," and has obtained authorizations from the investors to proceed to foreclosure, but with the understanding that there will be no foreclosure or repossession of the equipment if the money, plus interest, is paid promptly after this Court's decision of the present application.

Initially, the Government argued that this Court should now require Citibank, as agent, to accept the $1.1 million installment payment and to execute an assignment to USRA, *pro tanto*, of the investors' rights against the Debtor. Apparently, this was on the theory that more than two-thirds of the investors had expressed willingness to go along with the proposal, and that their views would be binding upon the minority. It seems quite clear, however, that only each particular investor has the right to assign his interest under the conditional sales agreement, and that neither Citibank nor the other investors can achieve such an assignment in his behalf without his consent. Apparently recognizing this problem, the Government has advanced a series of arguments based upon the equitable powers of the Court.

As I understand the Government's position, the argument runs somewhat like this: Section 215 of the RRRA contemplates acquisition by USRA of interests in equipment obligations. The recalcitrance of these investors threatens to frustrate the Congressional purpose in enacting the RRRA. Moreover, to permit the investors to foreclose against

the equipment would obviously frustrate not only the policies of the RRRA, but the overall goals of § 77 as well. So far as the investors are concerned, implementation of the Government's proposals would leave them in exactly the same legal position as they would be in if the payments were to be made by the Trustees in the usual course; thus, they would suffer no detriment, and their unreasonable refusal to cooperate does not generate any equities in their favor. Whereas § 77(j) of the Bankruptcy Act (preserved in the RRRA) protects the holders of equipment obligations from judicial interference with their title to the equipment, or with their right of possession of the equipment in the event of default, there are no problems of title to the equipment involved in the present impasse, and there is nothing to prevent the Court from declaring that a default has not occurred. Thus, if the Court is unwilling to enter a mandatory decree directing the investors to assign their interests to the Government in exchange for the installment payment, the Court should attempt to achieve the same net result by enjoining the investors from asserting a default, so long as they receive the installment payment from the Government, under the terms proposed by the Government. In short, if the Court cannot directly order the assignments to USRA, it should make voluntary assignments appear to be the desirable course for the investors to follow.

It has been argued by counsel representing Citibank (more fully in a chambers conference in connection with an earlier application by the Government for a temporary restraining order) that the Government is incorrect in its assertion that the investors would be unaffected by implementation of the Government's proposals. While conceding that the investors have no standing to object to the creation by the Trustees of junior liens upon the equipment, and that the Government's interests under the proposed assignment would be fully subordinated to those of the investors, Citibank argues that having USRA as a participant under the conditional sales agreements themselves, even in a subordinated capacity, imposes additional procedural inconveniences, notice requirements, etc. The Government points out that, while this might be true (though unimportant) in some situations, it is not even theoretically true in the present case, since these are the very same conditional sales agreements which were involved in the 1974 transaction covered by Order No. 1480; hence whatever procedural inconvenience might be involved is already necessitated by the voluntary assignments given by the investors on that occasion.

I believe both arguments are valid. That is, I agree that the initial implementation of the Government's proposals with respect to a particular conditional sales agreement transaction would leave the assigning investors in a slightly different posture than if the installment obligations were discharged in the normal course, but this form of prejudice is not present with respect to the $1.1 million installment obligation in question here. However, since the Government presses for a ruling of universal application, I believe it is necessary to give consideration to the prejudice which would arise in a normal case, disregarding the fortuitous circumstance that this particular set of agreements was the subject of the earlier transaction.

This approach is necessary, in my view, because an essential premise of the Government's argument is its concern with the possible frustration of the aims and purposes of Congress as expressed in the RRRA. The Government readily concedes, as it must, that the inability of USRA to obtain assignments with respect to this particular $1.1 million installment payment would have no substantial impact upon the implementation of the Final System Plan; but the Government insists that it is important to establish a precedent which will cause the holders of other equipment obligations to be willing in the future to con-

sent to assign their interests to USRA upon request. The matter will therefore be considered in that light.

The interests of the investors are assignable. Citibank is probably correct in its assertion that USRA as the holder of a *pro tanto* interest in the underlying obligation, even on a subordinated basis, would occupy a slightly different position from USRA as the holder of a junior lien created by some independent act of the Trustees. But neither Citibank nor the minority investors would have room for complaint if any investor were to make a partial assignment of his interest, either to USRA or someone else. Hence it seems probable that the alleged prejudice involves no greater burden than those within the original contemplation of the parties to the investment.

But what is really involved here is ascertainment of the intent of Congress. Section 215 of the RRRA authorizes USRA to acquire interests in equipment obligations, but it plainly does not provide for an exercise of the power of eminent domain with respect to such acquisitions. Granted, a reasonable holder of an equipment obligation ought to be willing to assign part of his interest therein to USRA in exchange for cash payment of an installment, rather than insist upon cancelling that much of the underlying debt, but the fact remains that Congress has not seen fit to impinge upon the unfettered right of such investor to do as he pleases with his own property.

■ On the other hand, I am persuaded that § 77(j) of the Bankruptcy Act does not preclude a reorganization court from decreeing that, so long as the holders of equipment obligations receive in cash a particular installment when due, they may not declare a default and attempt to accelerate the balance or repossess the equipment. Moreover, under such circumstances, I do not believe the holders of equipment obligations have standing to complain about the effects of such payment, from a legal standpoint, as between the Trustees and other parties.

The reason for the Government's insistence upon obtaining an assignment of a *pro tanto* interest in the equipment obligations, rather than an independently created junior lien, is the fear that the partial discharge of the equipment obligation by payment of the installment would instantly bring into play the after-acquired property clauses of the Debtor's mortgages, so that any independently created junior lien would be much more junior than USRA finds acceptable. Conceptually, this is no doubt correct, just as it is conceptually correct to state that, once the obligation to make a particular installment payment is discharged as between the holder of the obligation and the Debtor's estate, the holder would no longer have any rights to which the Government might be subrogated. But in the context of the recondite, even arcane, theories which infuse the dispute now before the Court, I believe it is possible to refine conceptualism still further.

■■ I have concluded, as discussed above, that the investors cannot be required to assign their interests to USRA without their consent. But I have also concluded that the investors ought not to be permitted to assert a default or enforce their obligation so long as they actually receive the money called for by the conditional sales agreements. There is room, therefore, for treating each installment payment as having the same effect as if the debt had thus been discharged, insofar as the holders of the equipment obligations are concerned, but treating it otherwise as between the Debtor's estate, USRA, and the holders of mortgages. In other words, I believe it is permissible for this Court to enter a decree declaring that, upon payment of a particular installment, the right of the investors to enforce the obligation to make that installment payment may not be asserted; that USRA would thereupon be equitably subrogated to the rights the equipment holders would oth-

erwise have had to enforce the obligation to make that payment; and that, as between the Debtor's estate and all other parties, the obligation to make the installment payment is not extinguished, but continues in existence pursuant to the terms of the arrangement between the Trustees and USRA.

█ A decree will be entered in conformity with the views expressed above. I do not believe the Court is permitted any further extension of its equitable jurisdiction in this context. By enabling the Government to carry out its proposals on an interim basis, I of course have in no way altered my view that the record does not justify this kind of deferrals by the Trustees. The assumption of liability by Conrail does not necessarily exonerate the Trustees. And even if it did, I do not believe the RRRA can properly be read as requiring a railroad which, by definition, cannot be reorganized on an income basis under § 77, to be reorganized on an income basis in a manner equivalent to unaided § 77. Congress plainly intended to provide the cash needed for interim operations, and intended that Conrail should bear the cost of acquisition and improvement, not the cost of preconveyance operations.

Finally, I believe it appropriate to acknowledge that the holders of the equipment obligations involved in the present application have exhibited commendable forbearance in not seeking to enforce a default, notwithstanding the delays occasioned by the Government's eleventh-hour intervention. I suggest the parties would be well-advised, should similar problems arise in the future, to avoid even the possibility of a technical default.

## ORDER NO. 2037

And now, this 8th day of October, 1975, upon consideration of the "Petition of United States of America for an Order Requiring Implementation [by First National City Bank (Citibank)] of Financial Assistance Agreement" (Document No. 9323), it is ordered, as follows:

1. Citibank and the investors it represents as agent in connection with the conditional sales agreements referred to in the Government's petition, are enjoined from treating as an event of default the events surrounding the Government's attempts to provide the equivalent of payment of the $1.1 million installment of interest referred to in the petition.

2. Upon receipt by Citibank as agent of the sum of money necessary to enable it to pay to each investor his or its *pro rata* amount of such installment, together with interest to the date of payment, Citibank and the investors shall be permanently barred from asserting any default based upon alleged non-payment of said installment, and from enforcing or attempting to enforce any further obligation on the part of the Debtor or the Trustees with regard to said installment.

3. If the sum necessary to comply with the preceding paragraph is furnished by or on behalf of USRA, then upon receipt of said sum by Citibank, USRA shall be deemed to be subrogated to all of the rights and remedies which the original obligees under the conditional sales agreements would have had to enforce payment of said installment, subject, however, to the conditions and limitations set forth in the financial assistance agreement between USRA, FRA and the Trustees, referred to in the Government's petition.

4. As between the Debtor's estate and the Trustees, on the one hand, and USRA, FRA and all other parties (except, in the case of Citibank and the investors it represents as agent, as above provided), the receipt by Citibank of the money aforesaid, and the payment to the investors, shall not be deemed to have extinguished the original obligation *pro tanto,* nor to have reduced *pro tanto* the amount of the lien against the equipment in question.

5. If USRA is unwilling to supply and release the sums necessary to carry

out the arrangements contemplated in the preceding paragraphs so that the funds can be disbursed by Citibank not later than October 15, 1975, then the Trustees shall forthwith, not later than the close of business on October 16, 1975, pay said sums to Citibank out of the general funds of the Debtor's estate, and the Government's petition shall thereupon be deemed to have been denied.