**In the Matter of PENN CENTRAL TRANSPORTATION CO., Debtor.**

**In re INTERIM FINANCIAL SUPPORT.**

**No. 70-347.**

United States District Court, E. D. Pennsylvania.

Aug. 12, 1975.

James E. Howard, Philadelphia, Pa., for the trustees, Penn Cent. Transp. Co.

Sullivan & Worcester, by Morris Raker, Boston, Mass., and Gratz, Tate, Spiegel, Ervin & Ruthrauff, by Wilbur Bourne Ruthrauff, Philadelphia, Pa., for Richard Joyce Smith, Trustee, New York, New Haven & Hartford Railroad Co.

Clark, Ladner, Fortenbaugh & Young, by W. Charles Hogg, Jr., and Edward C. Toole, Jr., Philadelphia, Pa., for Committee of Interline Railroads.

Ballard, Spahr, Andrews & Ingersoll, by Lewis A. Grafman, Philadelphia, Pa., for Girard Trust Bank and indenture trustees.

Jerome E. Sharfman, Washington, D. C., for United States Dept. of Transp.

James F. Dausch, Washington, D. C., for the United States.

## MEMORANDUM IN SUPPORT OF ORDER NO. 1981

FULLAM, District Judge.

On August 4, 1975, I entered Order No. 1981, in response to a further petition by the Government seeking to compel the Trustees to agree to allow the Government to pay certain installments on equipment obligations, but with the liability of the Trustees for such payments merely deferred rather than satisfied. This Memorandum is intended to set forth the reasons for that Order.

The first attempt by the Government to finance in this manner the operations

of the Debtor, until the date of conveyance to Conrail under the provisions of the RRRA, occurred in May of 1974, when a small amount of § 213 funds were used for that purpose. At that time, § 215 funds were not, as a practical matter, available. The Government's proposal, which was agreed to by the Trustees upon the express understanding that this would not constitute a precedent or set a pattern, was approved by this Court in Order No. 1480. At that time, I expressed the view that the legal position of the objecting creditors was clearly correct, but held that the emergency then existing permitted no alternative, and that failure to approve the transaction would do greater harm to the creditors' interests than the Government's proposal.

Thereafter, in connection with the application to Congress for additional funds to permit continued rail operation during 1975 and through March 1976, the Department of Transportation sought and obtained amendments to the RRRA, one of which authorizes the Secretary of Transportation (acting here through the Federal Rail Administrator) to enter into agreements with trustees of railroads in reorganization for the acquisition by the Administrator of, *inter alia,* "interests in" equipment obligations of such railroads.

The Government thereupon sought to compel the Trustees to agree to the use of § 215 funds to make all of the installment payments on equipment obligations, pursuant to arrangements whereby the Debtor's liability for such payments would not be extinguished, but would merely be deferred until after the conveyance to Conrail. This would have had the effect of deferring an additional $62 million in administration expenses. In denying the Government's petition at that time, in Order No. 1884, I filed an Opinion pointing out that there was nothing in the RRRA, the 1975 amendments thereto, or the legislative history, to suggest that Congress intended to require such deferrals, and that the Government had not established that the

creation of this new class of deferred priority debt was necessary. *In the Matter of Penn Central Transportation Co. (In re Interim Financing of Operations),* 395 F.Supp. 567 (E.D.Pa.1975). I pointed out that there was no showing that remaining § 213 funds, together with other § 215 projects clearly contemplated by the statute, would be insufficient to assure continuation of rail service.

The present petition of the Government seeks to establish that the proposed method of financing, which admittedly would seriously undermine the rights of creditors, is necessary, and can thus be approved by a § 77 reorganization court. A related argument appears to be that the proposed method of financing is "necessary" to the consummation of the Final System Plan pursuant to the RRRA, hence the normal standards of § 77 do not apply. It is necessary first to consider the competing financial projections that have been submitted by the parties. As the following analysis will show, the actual financial projections do not substantially conflict; the principal differences lie in the assumptions.

### I. *Analysis of Forecasts*

In analyzing the figures submitted by the parties, it is important to note certain difficulties of interpretation stemming from the way the record was established. For example, the Government's presentation involved data derived from cash forecasts submitted by all of the bankrupt carriers, not just the Penn Central. But the reliability of the methods for deriving data from carriers other than Penn Central was not touched upon in the hearings. Second, the Penn Central figures which were used by the Government were based upon a May 1975 forecast. Everyone agrees that important changes have occurred since then, but interpolation of these events into the forecast by FRA and Penn Central were not consistent. Third, Penn Central used a July 17, 1975 forecast which differed somewhat from its earlier forecast. Fourth, the figures

are for the period May 1975 through March 1976, but the Government's principal arguments relate to the closing figures at the end of February. Thus it was necessary to adjust the figures consistently to the closing February balances. Finally, some of the figures in a given forecast reflect actual results, and others reflect estimates of future results. For example, in the updated Penn Central forecast of July 17, actual expenses over budget for months of May and June are included, but there is no reduction in the forecast expenses for later months, even though these early expenditures may make it unnecessary to incur similar expenses in later months.

## A. *FRA Projections*

Starting with the data submitted by Penn Central in May of 1975 and information presumably submitted around the same time by other carriers, the FRA projected a total cash deficit of $287.9 million for the period May 1975 through February 1976. Implementation of § 215 programs already under agreement totaling $245.6 million should reduce this deficit by $165.5 million.[1] This reduction is attributable to the fact that most § 215 programs provide funds for work originally included as expenses in the forecasts relied on by FRA. A shortfall of $122.4 million, therefore, remains. Of the $85.5 million § 213 funds available,[2] the FRA is prepared to commit $70.5 million, leaving a reserve of $15 million in § 213 funds. Thus, $51.9 million in projected deficits remain unsatisfied.

On the assumption that no additional non-equipment financing of § 215 programs will be approved, the Government initiated proceedings before the various reorganization courts designed to secure relief which in one way or another would result in a partial reduction of the projected deficits. Petitions presently pending in other proceedings seek relief which would reduce the cash deficit by $10.7 million, and, if the relief requested in this petition is granted, there would be an additional reduction of $16.6 million.[3] The FRA would have $15 million in the § 213 reserve account and uncommitted § 215 funds available to meet the remaining deficit of $24.6 million. On its face, the situation presented to the FRA is indeed a difficult one, and, from FRA's perspective, the relief requested is quite reasonable. The validity of the FRA's projections is, however, subject to serious question.

## B. *Penn Central's Projections*

A $23.2 to $25.7 million overstatement of Penn Central's cash deficit at the end of February 1976 is suggested by the Trustees' evidence. The FRA deliberately overstated the deficit by $13.9 million when it reduced from 4.5% to 3.5% the effective yield factor used by Penn Central to calculate the revenue attributable to the June tariff increase. While reduction to a 4% yield is now accepted by the Trustees, an increase from 4.1% to 5.2% in the effective yield from the April tariff increase is now projected by the Trustees to result in an aggregate increase of $10 million in revenue over its May forecast. Thus, there is a $23.9 million variance. FRA also increased the deficit to reflect a $12.9 million excess in the actual material purchases during May and June over the forecasted amounts. The Trustees contend that this is unrealistic for two reasons: the materials will be used for § 215 projects and therefore netted out and, in any event, a new managerial control system

---

1. The Government's figure of $167.3 million appears to be inconsistent with Exhibit G–5.

2. The FRA takes the position that an additional $25 million in § 213 funds provided for in the RRRA may be used only for improvements in the Northeast Corridor.

3. The Government also sought to have $900,000 in interline trust fund payments halted. Since I did not grant the Government's request to halt the July payments, only $600,000 in interline payments remain within the prayer for relief. The record is now complete with respect to this issue. (See Order No. 1989.)

will permit the Trustees to limit future purchases and thereby bring the total material purchases through February within the May forecast. Finally, the Trustees estimate recent employee furloughs will save $1.4 million more than the $9.5 million assumed by the FRA. The total variance is $38.2 million. A negative adjustment to this amount is necessary to reflect the possibility of the repayment of a $15 million advance which was made by the FRA to make up for Amtrak's inability to meet its contractual obligations to the Trustees on schedule. If these factors are given full effect, the aggregate shortfall in February for all carriers would be $99.2 million instead of $122.4 million. Since the FRA made the same reductions in effective yield for the other carriers as it did for Penn Central, it would follow that an additional reduction in the shortfall is appropriate. The best that can be done on this record is to estimate the debt reduction would be between $2.59 million and $10.36 million.[4]

Similar results are arrived at when Penn Central's July 17, 1975 forecast is utilized. $185.9 million is the projected deficit through February. This must be reduced by $145.2 million, FRA's projected cash impact of Penn Central's § 215 programs. In addition, $10 million more must be subtracted to reflect revenue attributable to the increase in the effective yield of the April tariff increase which was not included in the July 17 forecast. The net effect of this is to result in a $25.5 million smaller deficit than that shown by the Government.

The chart below summarizes the various projections.

A. FRA Projections (in millions)

| | Penn Central | Others | Total |
|---|---|---|---|
| Deficit May 1975 through Feb. 1976 | ($201.6) | ($86.3) | ($287.9) |
| Cash Impact § 215 | 145.2 | 20.3 | 165.6 |
| Total | (56.4) | (66.0) | (122.4) |

B. FRA Projection with Trustees' Adjustments (in millions)

| | Penn Central | Others | Total |
|---|---|---|---|
| Deficit May 1975 through Feb. 1976 | ($178.4) | ($86.3) | ($264.7) |
| Cash Impact § 215 | 145.2 | 20.3 | 165.5 |
| Total | (33.2) | (66.0) | (99.2) |

C. FRA Projections for Other Carriers Combined with Trustees' July 17, 1975 Forecast (in millions)

| | Penn Central | Others | Total |
|---|---|---|---|
| Deficit May 1975 through Feb. 1976 | ($175.9) | ($86.3) | ($262.2) |
| Cash Impact § 215 | 145.2 | 20.3 | 165.5 |
| Total | (30.7) | (66.0) | (96.7) |

4. These numbers are derived by multiplying the deficit attributable to all other carriers, $86.3 million, by 3% and 12%. The percentages were in turn derived by taking one-half of the $13.9 million overstatement of Penn Central's deficit and converting it to a percentage of Penn Central's total deficit, $201.6 million, and converting $239 million to a percentage of Penn Central's total deficit. One-half of $13.9 million was used in order to show a reduction from 4.5% to 4% for the effective yield of the June tariff increase.

It should be noted that the July forecast incorporated in Chart C did not contemplate repayment of the $15 million advance. On the other hand, the figures do include $15.3 million for materials purchased in excess of the budget. If this excess is netted out by § 215 payments or curtailment of future purchases to bring the total purchases within the original total for the forecast period, the $15 million repayment and the $15.3 recoupment of the purchase overrun will cancel each other out.

Also in Chart C the FRA's estimate, $145.2 million, of the cash impact of Penn Central's § 215 programs was used. The July forecast indicates a $127.9 million cash impact. $14.1 million of the difference results from the inclusion of that amount for the cost of transporting § 215 materials within the system. Since the FRA will determine whether that payment is forthcoming, it is proper to accept its judgment to include the $14.1 million. The remaining $3.2 million difference arises in part from the fact that DOT expects some of the § 215 programs to proceed faster than Penn Central's forecast contemplates. For present purposes, I have not made an allowance of the $3.2 million variance.

One further point warrants discussion. Based on the July forecast, the FRA properly concluded that the deficit shown on the May forecast should be increased by $10 million. The July forecast contained a revenue reduction of $4.5 million attributable to New Jersey's failure to make commuter subsidy payments. The Trustees expect these funds to be forthcoming shortly. The remaining variance is due to a higher accounts payable entry during July which will probably prove higher than actual payments or be offset by lower payables in future months.

## II. *Discussion*

■ The Government's petition, like its original petition which led to Order No. 1884, is addressed to this Court's general supervisory power over the Trustees and over the Debtor's estate, under § 77(c)(2) of the Bankruptcy Act. Ordinarily, a reorganization court must exercise its discretion by applying familiar standards; preservation of the debtor's estate, the best interests of its ultimate reorganization, the public interest in continued rail service, maintaining the correct relative positions of claimants in light of the absolute priority standard, and avoidance of unnecessary infringement of legitimate property interests. For the reasons previously stated in support of Order No. 1884, *In the Matter of Penn Central Transportation Co., Debtor (In re Interim Financing of Operations)*, 395 F.Supp. 567 (E.D.Pa.1975), I am satisfied that the applicability of these same standards has not been eliminated by the enactment of the RRRA, but that these criteria must now be applied in light of the provisions and purposes of the RRRA.

■ The provisions of the Bankruptcy Act no longer apply in matters which are necessary to the formulation and consummation of the Final System Plan under the RRRA, to the extent of any inconsistency. Thus, at least in theory, the first question to be answered is whether the Government's proposed method of financing is necessary to the formulation and consummation of the Final System Plan. If so, nothing in the Bankruptcy Act would be sufficient to bar the proposal.

■ Arguably, the same result would be reached by starting the analysis at a different point: deferral of operating expenses may be authorized under § 77 if there is a sufficient showing of necessity (if reorganization seems assured, or during a reasonable period for exploring alternatives); thus, applying § 77 criteria so as to preclude further deferrals of operating expenses unless entirely necessary is not inconsistent with the RRRA. Under either approach, the test is the necessity of the deferral. Reading

§ 77 in the light of the RRRA, the definition of "necessity" should be the same: Is the proposal necessary in order to support continued operation of the railroad until the conveyance date? And, contrary to some of the suggestions which can be derived from the Government's brief in both this and the earlier proceedings, the determination is one which must ultimately be made in the courts, in the event of dispute. That is, the Government does not establish that its proposal is necessary for the implementation of the Final System Plan, merely by producing evidence that the Federal Rail Administrator has so concluded. It bears emphasis that the RRRA provides only for *agreements* between the FRA and the Trustees. The Act does not empower the FRA to require the Trustees to agree. Presumably this Court does have the power to direct the Trustees to agree with the FRA, but that power derives from § 77, not the RRRA.

■ And of course, neither the RRRA nor any other statute empowers this Court or any other court to direct the FRA, with regard to agreements for interim financing.

As suggested at the outset of my analysis of the financial projections submitted by the parties, the principal differences between the parties relate to the validity of assumptions made by each. While I very much doubt that Congress intended to require, even as a last resort, the trustees of bankrupt railroads to create new kinds of priority claims by deferral of operating expenses,[5] I have attempted in Order No. 1891 to provide an opportunity for the testing of many of these assumptions.

One of FRA's assumptions is that the amount of funding provided by §§ 213 and 215 represents the absolute ceiling, and that there will never be any additional authorizations by the Congress for the support of interim rail service. At the time the present application was filed, this assumption was more clearly justifiable than at present. The RRRA, as amended in 1975, could be carried out without further action by Congress, and it was apparent that Congress believed it had provided adequate funding through the conveyance date. However, the Final System Plan which has now been proposed cannot be carried out unless Congress acts affirmatively to amend the RRRA further so as to provide, *inter alia,* additional funding.

A second assumption in the FRA projections is that $25 million in § 213 funds must be earmarked for Corridor improvements having little or no cash flow impact. It is conceded that the RRRA does not mandate this conclusion, but the FRA, understandably, feels a certain obligation to reserve the $25 million for that purpose, since it was apparently represented to congressional committees readying the 1975 amendments that the money would be used for that purpose. There is, of course, some logical inconsistency in this; the Corridor improvement projects fit perfectly into the pattern of projects for which § 215 funding was designed, and seem on their surface to be the virtual antithesis of § 213 projects. Insistence upon using § 213 money for the Corridor improvements, while at the same time insisting that the Trustees "borrow" § 215 money to meet their current operating expenses, is arguably equivalent to insisting that the Trustees should borrow money in order to improve the Corridor for Amtrak, a result which would be indeed

---

5. If that had been the intention, it would have been a simple matter to provide for the issuance of additional trustees' certificates (Government-guaranteed, if necessary). The effect of such a provision upon the outcome of the constitutional litigation is problematical. Moreover, as discussed in connection with Order No. 1884, I am entirely convinced that Congress did not intend to encourage resort to the Tucker Act, and that it would be squarely contrary to the intention of Congress for this Court now to avoid grappling with the precise issues before the Court by permitting the parties to treat the putative Tucker Act remedy as a sort of limitless credit card.

difficult to discern as corresponding to congressional intent.

The FRA argument for necessity is based also upon FRA's conclusion that no additional § 215 projects will be approved. This conclusion, in turn, is based upon a definition of acceptability of § 215 projects (physically identifiable with a particular segment of railroad, resulting in measurable improvement, having a very high percentage of cash flow impact, and not yet commenced) which is not based upon any statutory requirement. It is not for this Court to determine for the FRA just what should be acceptable targets for § 215 financing. By the same token, however, the FRA cannot be permitted to create an image of necessity merely by creating unnecessary restrictions upon the flexibility contemplated by the statute.

Another assumption still open to question is that there is no permissible method of insuring that the Trustees' obligation to repay the equipment installments met by the Government would be limited to the amount by which the Debtor's equity in the equipment would thereby be increased. This issue was discussed in connection with Order No. 1884, and need not be discussed again now, except to note that the record still does not contain a convincing obstacle to that solution.

With respect to the figures themselves, the principal differences are that the FRA assumed a favorable impact at the rate of 3.5% stemming from existing rate increases, whereas the Trustees project the equivalent of about 4.0%. A further prospective rate increase which may become effective in October 1975 is not reflected in any of the projections of the parties.

 Order No. 1981 reflects the view of this Court that, while the Government has not yet demonstrated that its proposals for providing interim financing by the device of making installment payments on equipment obligations is necessary, or that such deferral of operating

expenses is legally permissible, no harm would be done by permitting the Government's proposal to operate for a reasonable period. If the Trustees were directed to continue to make the installment payments themselves, and if it should later turn out that the Government was correct throughout, then that method of interim financing would be irretrievably lost. On the other hand neither the Debtor's estate nor the interests of its creditors will suffer detriment, so long as the Trustees' obligations to make the installment payments are not too long deferred. I have accordingly authorized and directed the Trustees to comply with the Government's request, but have further directed the Trustees, not later than December 1, 1975, to exercise their right under the agreement to repay to the Government the sums advanced, so as to extinguish the underlying debt to that extent. The goal is to insure that, at the very least, no additional "permanent" deferrals of administration expenses will have been permitted to co-exist with any balance of unexpended § 213 or § 215 funds as of the conveyance date. If the situation should change in ways which bear out the Government's predictions, the matter can again be reconsidered before the Trustees carry out the repayments. Moreover, it seems reasonable to suppose that a more accurate prediction of the date of the conveyance can be made in November than at present.

One further factor should be emphasized. In Order No. 1987, I have approved the agreement pursuant to which the Trustees will commence the project for maintaining and upgrading the Corridor; i. e., the parties will start to spend the $25 million in § 213 funds referred to above. However, only $8 million in actual expenditures are contemplated during the calendar year 1975. The parties are on notice that, unless additional § 215 funds are to be utilized, either in connection with the Corridor improvements or otherwise, in ways which do not involve deferral of operating expenses

(*i. e.*, an obligation to repay in excess of increases in equity), some part of those "earmarked" funds may have to be diverted for the basic § 213 purpose of insuring continuation of rail service until the conveyance date.