533 F.2d 1347
 In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.
Appeal of UNITED STATES of America.
In the Matter of CENTRAL RAILROAD COMPANY OF NEW JERSEY, Debtor.
Appeal of R. D. TIMPANY, Trustee of the Property of the
Central Railroad Company of New Jersey.
 Nos. 75-1902, 75-2031 and 75-2151.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 12, 1976.
Decided March 3, 1976.
 
 Rex E. Lee, Asst. Atty. Gen., Washington, D. C., Robert E. J. Curran, U. S. Atty., Philadelphia, Pa., Morton Hollander, David J. Anderson, James F. Dausch, Dept. of Justice, Washington, D. C., for United States, appellant in No. 75-1902 and No. 75-2151, and appellee in No. 75-2031; John Hart Ely, Gen. Counsel, Jerome E. Sharfman, Michael T. Haley, Dept. of Transp., Washington, D. C., of counsel, for appellant in No. 75-1902.
 James E. Howard, Philadelphia, Pa., for Robert W. Blanchette, Richard C. Bond and John H. McArthur, Trustees of the property of Penn Central Transportation Co., Debtor, appellees in No. 75-1902 and No. 75-2151.
 Frederic L. Ballard, Lewis A. Grafman, Philadelphia, Pa., for Institutional Investors Penn Central Group and Indenture Trustees, appellees in No. 75-1902.
 Morris Raker, Stewart W. Kemp, Boston, Mass., for Richard Joyce Smith, Trustee of the property of The New York, New Haven, and Hartford Railroad Company, Debtor, appellee in No. 75-2151; James Wm. Moore, New Haven, Conn., Gratz, Tate, Spiegel, Ervin & Ruthrauff, Philadelphia, Pa., Sullivan & Worcester, Boston, Mass., of counsel.
 Stanley Weiss, Robert E. Turtz, Newark, N. J., for R. D. Timpany, Trustee of the property of The Central Railroad Company of New Jersey, appellant in No. 75-2031; Richard B. Wachenfeld, Newark, N. J., of counsel; Dean R. May, Newark, N. J., on the brief.
 Before HASTIE, GIBBONS and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 HASTIE, Circuit Judge.
 
 
 1
 Two orders, No. 1884 and No. 1981, issued May 16, 1975 and August 4, 1975, by the District Court for the Eastern District of Pennsylvania in the Penn Central railroad reorganization and an order, No. 764 issued July 22, 1975, by the District Court for the District of New Jersey in the New Jersey Central railroad reorganization, have been appealed to this court. The three orders adjudicate similar controversies about the terms upon which the courts should require the trustees of the railroads in reorganization to accept federal financing of their operations. They have been consolidated for hearing and disposition.
 
 
 2
 These controversies have been generated by the Regional Rail Reorganization Act of 1973 (hereinafter, the Rail Act) 45 U.S.C. § 701. In that Act, Congress has provided for the organization and financing of a new corporation, Consolidated Railway Corp. (hereinafter, ConRail) that is to supply essential rail service after it shall purchase whatever property of the railroads now in reorganization may be needed for its operations. But Congress also recognized that the implementation of this plan would take time and that during the interim the trustees of the railroads in reorganization would have no choice but to continue to provide rail service at a substantial loss to the insolvent corporate estates. Accordingly, the 1973 Act and its 1975 amendments authorize interim federal financial aid to the trustees.[1] In dispute here are, the terms upon which aid is to be provided.
 
 
 3
 We begin with the appeals of the United States from the two judicial refusals to require the Penn Central trustees to accept federal financial aid upon terms proposed and insisted upon by the Federal Railroad Administrator (hereinafter, FRA), the responsible federal officer[2] who administers the federal financial assistance to railroads in reorganization that is authorized by sections 213 and 215 of the Rail Act.
 
 
 4
 Pending the conveyance of railroad properties to ConRail, section 215 provides for federal financing of interim maintenance and improvement of railroad properties and for government acquisition of "interests in such rail properties . . . or in purchase money obligations therefor". The same section specifies that funds, not to exceed $300,000,000, for these purposes shall be obtained through obligations to be issued by the United States Railway Association and guaranteed by the United States. And in this connection it is expressly required that "the Corporation (ConRail) . . . (shall) assume any such obligations" when it takes over the railroad service. There is a further provision that in the final system plan under which ConRail shall operate, the Secretary of Transportation may designate a portion of these obligations "from which . . . (ConRail) shall be released . . . ."
 
 
 5
 The federal financing transactions proposed and in question here are, in the language of section 215, governmental acquisitions of "interests in . . . purchase money obligations" of the now bankrupt railroad. More particularly, the "obligations" are in essence long term conditional sale contracts under which Penn Central has acquired rolling stock and other essential equipment. Under section 215, FRA could, simply and without more, pay to equipment sellers whatever installments become due under Penn Central's purchase money contracts. Beyond this, any mutually acceptable resultant obligation of the railroad to the United States can be defined by agreement between the parties.
 
 
 6
 In the present case, FRA and the Penn Central trustees have been unable to agree what obligation to the government, if any, the bankrupt estate should assume in return for the government's payment of the railroad's equipment obligations. FRA insisted upon agreement by the trustees that, upon payment of any installment of a purchase money contract, the United States Railway Association should acquire "the same rights as the original obligees under such equipment obligations" enjoyed before payment to them. However, the government would stipulate that as long as the trustees remain in possession of the equipment, they will be excused from the payment of interest or principal to the Railway Association. Nothing was to be said about the nature or extent of the rights against the Penn Central estate that would survive after ConRail's acquisition of the equipment. The trustees refused to agree to these terms and FRA petitioned the reorganization court to order them to enter into the agreement as proposed. In Order No. 1844 of May 16, 1975, the first of those from which these appeals have been taken, the court denied FRA's petition. Thereafter, FRA and the trustees continued to negotiate about federal financing under section 215. These negotiations resulted in agreements, subsequently approved by the reorganization court, for the use of section 215 grants to pay for scheduled maintenance-of-way and maintenance-of-equipment expenditures that otherwise would have consumed about $144,000,000 of the railroad's operating revenue. In these circumstances, the trustees were able to pay equipment obligation installments out of operating revenues as they matured through the month of July, 1975.
 
 
 7
 In the meantine FRA addressed a new petition to the reorganization court asking that the trustees be required to agree, under terms like those outlined above, to FRA purchases of other Penn Central equipment obligations that would mature during the months ahead. The district court's decision on that petition, Order No. 1981, is the subject of the second appeal that will be considered in this opinion.
 
 
 8
 Because the trustees have now paid out of operating income those installments of equipment operations that matured before August, 1975, and because financing of subsequently maturing obligations is the disputed matter on the second appeal, we hold that the first appeal, at our No. 75-1902, has been mooted by events subsequent to the district court's order.
 
 
 9
 We turn now to Order No. 1981 and the appeal from it at our No. 75-2151. Order No. 1981 was entered on August 4, 1975, after FRA and the Penn Central trustees had presented differing forecasts of Penn Central's anticipated deficit and need for additional financing in order to continue rail service through the second half of 1975 and until that time in 1976 when ConRail probably will take over the railroad operation. The parties also continued to disagree whether, in any event, the trustees should be required to accept the terms upon which FRA proposed to purchase monthly installments of equipment obligations.
 
 
 10
 The reorganization court adhered to its view, stated in its earlier Order No. 1884, that, on the proof before it, the trustees should not be required to accept FRA's terms. But it also recognized that, on appeal, this court might disagree with its view. Moreover, if the trustees did not accept FRA's proposal, they would be obliged to pay monthly installments of equipment obligations out of operating revenue, and they planned to continue to do so. Thus, the matter in dispute might again be mooted before we could decide an appeal from this second denial of an FRA petition.
 
 
 11
 Moved by these considerations, the reorganization court ordered the trustees to accept the terms of FRA's proposal for government purchases of August and September installments of equipment obligations. But, over FRA's objection, the court included a provision that gave the trustees the right to repay the government and thus discharge its debt before ConRail should take over this equipment and the operation of the railroad.[3] Pursuant to this order the government paid August and September equipment obligation installments aggregating some $11,000,000.
 
 
 12
 On this appeal, the government asks that we reverse so much of Order No. 1981 as authorizes the trustees to discharge their debt by reimbursing the government. On the other hand, we are advised that the trustees have already tendered the government a check for $11,000,000 in full payment of the debt incurred in August and September, that the tender has been refused and that the trustees have set aside in a special account funds sufficient to cover the tendered payment.
 
 
 13
 Throughout this controversy FRA has complained and argued that the trustees and the reorganization court are frustrating FRA's effort to respect a Congressional purpose, declared in section 101 of the Regional Rail Reorganization Act, to maintain essential rail service through "necessary Federal financial assistance at the lowest possible cost to the general taxpayer." 45 U.S.C. § 701(b)(6). At least at first blush, therefore, it seems strange that the government should object to a judicial order that Penn Central trustees reimburse the government for expenditures it has made for Penn Central's benefit. Indeed, the trustees' tender of $11,000,000 to reimburse the government, as authorized by the reorganization court, seems a direct way of immediately minimizing any "cost to the general taxpayer" of financial assistance to Penn Central. Moreover, earlier in this reorganization, in connection with 1974 emergency government payments of Penn Central equipment loan installments the United States and the trustees had agreed that "the Trustees may . . . pay to the United States any amount which it has paid . . . ."[4]
 
 
 14
 In any event, the trustees' repayment of the $11,000,000 obligation can possibly impose additional cost upon the general taxpayer only if the resultant depletion of Penn Central's cash will necessitate an additional infusion of federal money to maintain service until ConRail shall take over. Unless that is the case, the government's argument is not even colorable.
 
 
 15
 We do not know, however, what the needs of the railroad operation are and will be, or what resources are and will be available to satisfy them during the remaining short period of Penn Central railroad service. All of the circumstances considered, we think the reorganization court should make a new current and final appraisal of the need for and effect of any repayment of equipment obligations during this period. To facilitate that process we add the following observations to what has already been said in this opinion.
 
 
 16
 We have pointed out that the equipment obligations are in the nature of long term installment contracts of conditional sale under which Penn Central purchased rolling stock and other equipment that the trustees now continue to use to provide rail service during reorganization. The trustees have had no choice but to assume these obligations. For, under section 77(j) of the Bankruptcy Act, a railroad reorganization proceeding does not affect the contractual right of a conditional seller of railroad equipment to repossess the equipment in case of default.
 
 
 17
 Since this equipment is in continuing use, it is depreciating apace. It follows that, in an accounting view, each payment of a matured installment on a railroad equipment obligation has three components: (1) interest on deferred purchase money, (2) a payment on the now depreciated part of the equipment's original value and price, and (3) a remaining amount by which the value of the railroad's equity in the equipment is increased. The present record indicates that the third of these components is only a minor fraction, probably less than 20 per cent of each of Penn Central's 1975 purchase money installments. More than 80 per cent of each payment represents interest and depreciation, both elements of the cost of continuing to operate the railroad, as Congress has required in the public interest, after any prospect of successful reorganization on an income basis has disappeared.
 
 
 18
 In these circumstances, the trustees and the reorganization court are properly concerned that, insofar as possible, interest and depreciation, that are costs of enforced continuing section 77 operation, be paid currently out of operating income so that the insolvent estate will not be burdened with an additional multi-million dollar deferred cost of administration.[5] Although the Regional Rail Reorganization Act has supplemented and modified section 77 procedure to the extent necessary to accommodate the projected inauguration of rail service by a new corporate entity, the section 77 reorganization of Penn Central Transportation Company has not ended. The section 77 trustees and the reorganization court have not been relieved of their responsibility to consider and deal equitably with all claimants who have an interest in the Penn Central estate. True, the Supreme Court has determined that Penn Central creditors have an ultimate remedy under the Tucker Act for erosion losses the government has forced upon the bankrupt estate. Regional Rail Reorganization Act Cases, 1974, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320. And the Court deemed that remedy constitutionally adequate. But the legitimate interests of Penn Central creditors are fairly and more fully served by additional measures calculated to prevent or minimize erosion losses and thus to avoid the long delays and practical uncertainties about recoupment that unavoidably will attend resort to a Tucker Act remedy.
 
 
 19
 In this case, the reorganization court was properly reluctant to approve any agreement that, as that court's opinion characterized it, would "create additional high priority debt in order to finance loss operations of the railroad . . . (while) government planners are . . . seeking to devise a 'Final System Plan' . . . ." Unpersuaded that resort to this financing device was unavoidable, the court adopted the expedient of authorizing financing on the government's terms for the time being, but requiring that the trustees be allowed to repay this high priority debt, leaving FRA and the trustees to find some other arrangement for supplying any unfilled cash requirements of the government imposed interim railroad operation.
 
 
 20
 FRA counters by arguing that any responsibility the reorganization trustees might normally have to safeguard the interests of creditors is legislatively overridden here by the Rail Act's general declaration of Congressional purpose to provide "necessary Federal financial assistance (for essential rail service) at the lowest possible cost to the general taxpayer". 45 U.S.C. § 701(b)(6). We read this language as an earnest entreaty to economize, addressed to those who are authorized to spend many millions, ultimately billions, of dollars in preserving and subsidizing essential rail service.[6] Indeed, Congress seems to have spoken in contemplation of the high cost of financing the contemplated ConRail project, not merely the smaller cost of interim financing before the ConRail takeover. In any event, the legislative language does not even purport to be a directive to the judiciary. This is not to deny that a court asked to approve a proposed scheme of deficit financing under the Rail Act, should seriously consider, as the reorganization court has done here, the general concern of Congress to avoid unnecessary cost to the general taxpayer. But that is not the only proper and relevant consideration. A reorganization court must also be mindful that it is the government that has compelled the insolvent railroads to continue in the public interest to supply rail service,[7] unavoidably consuming their dwindling assets in the process, and that it is the creditors of the railroad who are forced, for the time being at least, to bear the burden of that erosion. Fairness, beyond minimum constitutional requirement, to those thus harmed is also a legitimate consideration.
 
 
 21
 In our view, a reasonable accommodation of interests can and should be achieved. In late winter, 1976, the ConRail takeover of rail service is sufficiently imminent[8] to permit a reliable forecast of both the expenditures that must be made before takeover and the resources that are or can be made available to the trustees to meet them. The picture of interim financing needs and potential under sections 213 and 215 for each and all of the insolvent railroad operations should now be clear and complete. Thus informed, the court can determine whether the money the trustees would use for repayment of equipment related debt to the United States is needed to finance the continuation of rail service until April.
 
 
 22
 To this end the reorganization court's present blanket direction that the trustees shall repay their equipment debt to FRA will be vacated and the trustees will be required to justify whatever repayment they propose by showing to the satisfaction of the reorganization court that the funds needed to support the continuation of adequate Penn Central rail service until the ConRail takeover can and will be provided without the use of the money in question.
 
 
 23
 In dissent, Judge Gibbons expresses the view that the Regional Rail Reorganization Act has "stripped the reorganization courts of their powers of equitable oversight" over arrangements that may be made between FRA and the trustees for federal financing of ongoing section 77 operations. While our disagreement with that conclusion has already been expressed, the present posture of this case prevents the dispute over the originally proposed terms of federal financing from being a critical issue now. For the Penn Central trustees, as well as the New Jersey Central trustee, have executed the agreements for government financing of equipment loan installments on the terms proposed by FRA. The only question is whether and under what circumstances the trustees may reimburse the government before the ConRail takeover.
 
 
 24
 The dissenting opinion points out the probability that the government will recoup part of its investment in Penn Central equipment loans by way of reduction of the price ConRail would otherwise have to pay the Penn Central estate for that equipment. This circumstance is relied upon as an indication that we should not permit repayment now. But repayment in full now must be more advantageous to the general taxpayer than some partial recoupment that may be realized later when it is determined how much ConRail must pay for the Penn Central rolling stock. The dollar value of the possible future benefit to ConRail could not exceed, probably would be much less than, the amount of the equipment installments which the trustees propose to repay now. And to the general taxpayer, for whose financial burden Congress has expressed concern, the certainty of present repayment in full to the federal financing agency that rendered assistance can hardly be less beneficial than a prospective accrual of a part, or even all of that sum, for the future benefit of another corporation that is dependent upon the government for much of its financing.
 
 
 25
 There is nothing in the Regional Rail Reorganization Act that prohibits or discourages reorganization trustees from reimbursing the government for financing railroad operations. The dissenting opinion points out that section 215(b) empowers the Secretary of Transportation to prescribe "reasonable terms and conditions" upon which financial assistance will be provided. But we do not believe refusal to accept repayment is comprehended by this language. To us it seems a proper function of the reorganization court to determine whether such reimbursement will be fair to the interested parties and can be accomplished without jeopardizing the service which the trustees must continue to provide, probably until about April 1. To dispose of this case we think it is sufficient to indicate the considerations that should influence that determination and to instruct the district courts to make a new adjudication of each reimbursement proposal before the contemplated April 1 transfer of property and operating responsibility to ConRail.
 
 
 26
 In the New Jersey Central railroad reorganization, the reorganization court was persuaded that a government purchase of the railroad's equipment obligation installments in the amount of $223,698.51, on terms essentially like those originally rejected by the Penn Central court, was necessary to enable the trustee to continue rail service until the ConRail takeover. As in the Penn Central case, the resultant debt to the government is a high priority claim that has been deferred.
 
 
 27
 The New Jersey Central trustee now argues that there neither was nor is justifying need for this type of financing to the disadvantage of creditors. Here too, we think that, whatever financial predictions may have been reasonable last summer, the imminence of the ConRail takeover now permits a much better informed determination whether this debt need be left unpaid in March, 1976. To that end we will affirm Order No. 764, but the trustee shall be permitted to show the reorganization court, if he can and will, that resources at hand or about to become available are sufficient to permit repayment of the debt in question without jeopardizing the continuity of rail service.
 
 
 28
 At our No. 75-1902, the appeal will be dismissed because of mootness.
 
 
 29
 At our No. 75-2151, the order of the reorganization court will be modified to require that the trustee show, in conformity with this opinion, that current resources, considered in the light of operating needs, justify each proposed payment of the equipment debt to the government.
 
 
 30
 At our No. 75-2031, the order of the reorganization court will be affirmed and also supplemented by leave granted to the trustee to show, in conformity with this opinion, that current resources, considered in the light of operating needs justify payment of some or all of the equipment debt to the government. Each party to bear its own costs.
 
 
 31
 Our mandate shall issue forthwith.
 
 
 32
 GIBBONS, Circuit Judge (concurring and dissenting).
 
 
 33
 I agree with the majority that the No. 75-1902 (Penn Central) appeal can at this stage be dismissed as moot. But because I cannot agree with the majority's assumption that the Regional Rail Reorganization Act of 1973 (RRRA), 45 U.S.C. § 701-93, as amended, Pub.L. No. 94-5, 89 Stat. 7 (1975), preserves intact the equitable power vested in the reorganization court by § 77 of the Bankruptcy Act, 11 U.S.C. § 205, to protect the debtor estate from erosion that is not of constitutional dimensions, I cannot join in the balance of the court's opinion. And because I believe that the majority has erred in holding that the Penn Central and Jersey Central Trustees have a conditional right to repurchase equipment obligations acquired by the United States Railway Association (USRA), I respectfully dissent from the disposition of No. 75-2151 (Penn Central) and No. 75-2031 (Jersey Central).
 
 
 34
 I am neither unaware of nor insensitive to the plight of the financially beleaguered creditors and bond-holders of both Penn Central and Jersey Central. See, e. g., In re Penn Central Transportation Co. (Columbus Options), 494 F.2d 270 (3d Cir.), cert. denied, 419 U.S. 883, 95 S.Ct. 147, 42 L.Ed.2d 122 (1974). That the estate of a railroad in reorganization must not be uncompensated for an erosion-taking in violation of the fifth amendment is made plain in the decisions of both the Special Court, In re Penn Central Transportation Co., 384 F.Supp. 895 (Sp.Ct.1974) and the Supreme Court, Regional Rail Reorganization Act Cases, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). And whether and under what circumstances and upon what conditions the estate of a railroad in reorganization can be forced to bear operational losses that do not amount to a fifth amendment taking are matters within the prerogative of Congress and not the courts. See generally the New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970); Penn-Central Merger and N & W Inclusion Cases, 389 U.S. 486, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968).
 
 
 35
 It is at this point that the majority and I part company. Judges Hastie and Rosenn agree with Judge Fullam that notwithstanding the Regional Rail Reorganization Act and its 1975 amendments, the reorganization court retains the equitable power to balance the competing interests of the taxpaying public on the one hand and of the debtor estate on the other in determining what form interim federal funding pending takeover by ConRail will take. I (and apparently Judge Whipple) am of the opinion that Congress has in the RRRA stripped the reorganization courts of their powers of equitable oversight, and has given to the Secretary of Transportation discretionary authority to determine how the appropriated funds should be disbursed.
 
 
 36
 * Because the RRRA has engendered this controversy, a brief review of its substance and structure is worthwhile. The provisions of the Act as originally enacted are reviewed with characteristic thoroughness in Judge Friendly's opinion for the Special Court, 384 F.Supp. at 904-10, and Justice Brennan's opinion for the Supreme Court, 419 U.S. at 109-17, 95 S.Ct. at 342-45, 42 L.Ed.2d at 334-38, and those discussions will be incorporated by reference here. Briefly, the RRRA establishes a United States Railway Association to prepare a "Final System Plan" for restructuring the railroads in reorganization into a "financially self-sustaining rail and express service system." § 206(a)(1) of the Act, 45 U.S.C. § 716(a)(1). Upon implementation of the Final System Plan designated rail properties will be conveyed to ConRail, a private, nonprofit corporation, established by Congress to acquire and operate the conveyed properties pursuant to the Final System Plan. §§ 301-02 of the Act, 45 U.S.C. §§ 741-42. The properties will be conveyed in exchange for securities of the USRA. § 303 of the Act, 45 U.S.C. § 743.
 
 
 37
 Recognizing that the railroads in reorganization would require cash assistance in order to continue operations pending implementation of the Final System Plan, Congress authorized $85 million in grant money for the purpose of sustaining interim operations. § 213 of the Act, 45 U.S.C. § 723. Congress also authorized $150 million in expenditures for "the acquisition, maintenance, or improvement" of rail properties to be conveyed under the Final System Plan.
 
 
 38
 By the beginning of 1975 nearly all § 213 funding had been depleted and, because of defects in draftsmanship, no substantial quantities of § 215 funds had been distributed. To insure a continuation of interim rail operations pending the ConRail takeover, an infusion of new funds was required. Accordingly, Congress passed the Regional Rail Reorganization Act Amendments of 1975. Section 213 was amended by increasing the amount of direct assistance available under that provision. § 6 of the 1975 Amendments, 89 Stat. 8. More importantly, § 215 was recast to unfreeze the funds authorized thereunder by expanding the uses to which those monies could be put. As amended, § 215(a) provides:
 
 
 39
 (a) Purposes. Prior to the date upon which rail properties are conveyed to the Corporation under this chapter, the Secretary, with the approval of the Association, is authorized to enter into agreements with the trustees of the railroads in reorganization in the region (or railroads leased, operated, or controlled by railroads in reorganization)
 
 
 40
 (1) to perform the program maintenance on designated rail properties of such railroads until the date rail properties are conveyed under this chapter;
 
 
 41
 (2) to improve rail properties of such railroads; and
 
 
 42
 (3) to acquire rail properties for lease or loan to any such railroads until the date such rail properties are conveyed under this chapter, and subsequently for conveyance pursuant to the final system plan, or to acquire interests in such rail properties owned by or leased to any such railroads or in purchase money obligations therefor.
 
 
 43
 § 45 U.S.C. § 215(a), as amended, Pub.L.No. 94-5, § 7, 89 Stat. 8.
 
 
 44
 In its declaration of policy, which serves as a preamble to the substantive provisions of the RRRA, Congress asserted its paramount fiscal purpose to be to provide "necessary federal financial assistance (to the railroads in reorganization) at the lowest possible cost to the general taxpayer." § 101(b)(6) of the Act, 45 U.S.C. § 701(b)(6). Pursuant to this congressional directive the Secretary of Transportation sought in 1975 to exercise his statutory authority under § 215(a)(3) to purchase maturing equipment obligations of both Penn Central and Jersey Central. Although appropriated but unexpended § 213 funding was available that made such purchases not absolutely necessary, the Secretary realized that § 213 expenditures were unrecoverable grants. To see the railroads in reorganization through the expected year-end cash crisis, the Secretary decided to combine § 213 grants with § 215 expenditures for the improvement of rail properties designated for conveyance to ConRail, and purchases of maturing equipment obligations. Because the government would be entitled to seek an offset of monies expended for the purchase of equipment obligations against compensation ultimately due to the bankrupt railroads upon conveyance of their rail properties, see § 303(c)(1)(A) (i) of the Act, 45 U.S.C. § 743(c)(1)(A)(i), to the extent that monies expended could be recovered, the cost to the taxpayer of maintaining interim rail operations would be minimized.
 
 
 45
 The Trustees of both the Penn Central and Jersey Central Railroads refused to agree to the purchase of equipment obligations. The Penn Central reorganization court said that in exercising its power of superintendence over the bankrupt estate under § 77, it would not direct the Trustees to enter involuntarily into any such agreement absent affirmative proof that such action was necessary to consummate the Final System Plan. 400 F.Supp. 920, at 922. Because a residuum of § 213 grant money remained unexpended, the court determined that it would not force the Trustees to accede to a method of financing that would further diminish the worth of the debtor estate. Accordingly, Judge Fullam ordered only the conditional sale of equipment obligations to the government. Judge Whipple, in contrast, was of the view that the Jersey Central Trustee's resistance to the funding scheme impermissibly frustrated the policies of the RRRA. The court therefore ordered the Trustee to enter into the agreement proffered by the Secretary for the purchase of maturing equipment obligations. I would reverse the judgment and order of the Penn Central reorganization court appealed from in No. 75-2151 and affirm the Jersey Central reorganization court in No. 75-2031.
 
 II
 
 46
 Although it is now authoritatively established that the RRRA supplements but does not supersede the provisions of § 77 of the Bankruptcy Act, see Regional Rail Reorganization Act Cases, supra, 419 U.S. at 109, 95 S.Ct. at 342, 42 L.Ed.2d at 334, Congress has ordained that to the extent that provisions of the two statutes are irreconcilable, the text of the RRRA controls. Section 601(b) of the Act, 45 U.S.C. § 791(b), provides:
 
 
 47
 "The provisions of the . . . Bankruptcy Act are inapplicable to transactions under this chapter to the extent necessary to formulate and implement the final system plan whenever a provision of any such Act is inconsistent with this chapter."
 
 
 48
 It is not the appointed task of this court to exercise discretion and balance equities in the decision-making process where Congress has expressly or by implication decreed that we should not do so. The argument is made that Congress in the RRRA intended to truncate the reorganization court's equitable power under § 77 to superintend administration of the debtor estate by conferring upon the Secretary and the USRA discretionary authority to determine how appropriated funds should be spent. Our task is confined to determining whether preexisting limitations upon the exercise of that authority (e. g., § 77) survive the RRRA's enactment, and if so, whether that power is in any way circumscribed by constitutional considerations. We do not sit in judgment on the wisdom of otherwise valid legislation.
 
 
 49
 * In considering the question of congressional intent, we can quickly dismiss the Penn Central Trustees' objection to the Secretary's general authority to purchase equipment obligations. The RRRA as originally enacted did not in terms authorize such purchases. This omission was corrected with the 1975 amendment to § 215. Although the congressional reports accompanying the 1975 amendments make no reference to the purchase money obligations, the statutory authorization is clear and unambiguous.[1]
 
 
 50
 Both the Trustees and Judge Fullam rely heavily upon the following language of revised § 215(a) to support their position opposing the Secretary's proposed action:
 
 
 51
 "(a) Purposes. Prior to the date upon which rail properties are conveyed to the Corporation under this chapter, the Secretary, with the approval of the Association, is authorized to enter into agreements with the trustees of the railroads in reorganization in the region . . . (to purchase equipment obligations). (emphasis supplied).
 
 
 52
 It is said that this language merely delineates the Secretary's power to enter into an agreement for the purchase of equipment obligations with Trustees willing to enter into such a bilateral arrangement. The Trustees argue, however, that § 215(a) does not authorize the Secretary to unilaterally impose a contract upon them. Although in vacuo this would appear to be a plausible interpretation of the statutory language, § 215(a) must be read in conjunction with § 215(b). This latter provision provides:
 
 
 53
 "(b) Conditions. Agreements pursuant to subsection (a) of this section shall contain such reasonable terms and conditions as the Secretary may prescribe." (emphasis supplied).
 
 
 54
 Section 215(b), in my view, lays to rest the notion that the Trustees of the railroads in reorganization are to be coequal arbiters with the Secretary of the form federal financial assistance is to take, or even that they are to have any say at all. The unmistakable thrust of § 215(b) is to confer upon the Secretary discretionary authority to establish the terms upon which equipment obligations are to be purchased and, by necessary implication, discretion to determine who shall be a party to such a contract. This conclusion is inescapable if § 215(a)(3) is viewed as codifying the result in In re Penn Central Transportation Co., 373 F.Supp. 185 (E.D.Pa.1974), appeal dismissed, 508 F.2d 270 (3d Cir. 1975); see note 1 supra.
 
 
 55
 It seems plain to me that § 215 must be construed as establishing the primacy of the Secretary's determinations if the RRRA's articulated purpose of minimizing the cost to the taxpayers of interim assistance is to be realized. As has been noticed above, § 213 allocations are, for all intents and purposes, irretrievable grants to the railroads. Each dollar of funding made available under that section ultimately costs the taxpayers one dollar. Section 303(c) (1)(A)(i) of the Act, 45 U.S.C. § 743(c)(1)(A)(i), however, provides that:
 
 
 56
 (c) Findings and distribution. (1) After the rail properties have been conveyed to the Corporation and profitable railroads operating in the region under subsection (b) of this section, the special court, giving due consideration to the findings contained in the final system plan, shall decide
 
 
 57
 (A) whether the transfers or conveyances
 
 
 58
 (i) of rail properties of each railroad in reorganization, or of each railroad leased, operated, or controlled by a railroad in reorganization, to the Corporation in exchange for the securities and the other benefits accruing to such railroad as a result of such exchange . . . are in the public interest and are fair and equitable to the estate of each railroad in reorganization in accordance with the standard of fairness and equity applicable to the approval of a plan of reorganization or a step in such a plan under section 205 of Title II, or fair and equitable to a railroad that is not itself in reorganization but which is leased, operated, or controlled by a railroad in reorganization; (emphasis supplied).
 
 
 59
 The government in its brief contends that its purchase of the debtors' maturing equipment obligations can be characterized as an "other benefit accruing to such railroad" within the meaning of § 303(c)(1)(A)(i),[2] and hence can be counted as part of the consideration owing to the railroad estates after the conveyance to ConRail of rail properties has been completed. The benefit of these purchases accrues to the railroad upon conveyance of the properties to ConRail. At that time ConRail is required by the RRRA to assume all outstanding obligations of the debtors on rolling stock conveyed under the Final System Plan. § 303(b)(3) of the Act, 45 U.S.C. § 743(b)(3). Included in the obligations assumed by ConRail would be the railroads' liability to repay USRA for monies expended in acquiring maturing equipment installments. Because the railroads remain in possession of the equipment, its equity is increased by the amount (or some fraction thereof not representing depreciation or interest) of the obligation assumed. To avoid compensating the railroad for equity purchased at the government's expense, the Special Court will be asked under § 303(c)(1)(A)(i) to include a set-off against compensation due the conveying railroads some or all amounts spent in acquiring their equipment obligations. Every cent that is recaptured in this fashion represents a return to the taxpayer of money that could not have been recovered utilizing § 213 financing. At first blush, then, the selection of § 215(a)(3) in preference to § 213 financing would seem to advance the congressional policy of minimizing the burden to the taxpayer of maintaining interim rail operations pending implementation of the Final System Plan.
 
 
 60
 The Trustees argue, however, that this apparent economy is more illusory than real. They point out that § 215(c) authorizes USRA to release ConRail from any § 215 obligations that it may have incurred or acquired. Because the Final System Plan recommends that all but $36 million of the $300 million authorized under § 215 should be forgiven, United States Railway Association, Final System Plan, Vol. 1, at 92 (1975), the purchase of equipment obligations will accomplish no substantial saving for the taxpayer. But I am not prepared to say that the Secretary unreasonably concluded that a saving of this magnitude was not insubstantial and in any event preferable to expenditures no part of which could be recaptured.
 
 
 61
 Summarizing, I believe that the RRRA, as amended, gives to the Secretary of Transportation broad discretion in selecting the nature of federal financial assistance to the railroads in reorganization under the Act. As long as the Secretary's decisions are not arbitrary, capricious or otherwise an abuse of discretion, neither the railroads' Trustees in bankruptcy nor the reorganization courts have any license to resist or obstruct implementation of those determinations. On this record I perceive no basis for denying the Secretary the relief he seeks from the Trustees' obstinate refusals to enter into agreements for the purchase of equipment obligations. I do not believe that to be entitled to the remedy which he seeks the Secretary is obliged to affirmatively prove that the proposals for financial assistance which he tendered to the Trustees will in fact be more economical (from the perspective of the public fisc) than proposals advanced by the Trustees or the reorganization courts. I am satisfied that the Secretary reasonably could have concluded that his plan was consistent with the congressional mandate. The financing plan which the Secretary seeks, with the assistance of this court, to implement seems to me to be the antithesis of arbitrary and capricious action, including generous allotments of § 213 grant money and § 215(a)(1) and (a)(2) maintenance and improvement money, in addition to smaller sums designated for the purchase of equipment obligations. The proposal demonstrates less a callous disregard for the predicament of the debtors' creditors than a sensitiveness to the not-inconsiderable congressional dissatisfaction with the preexisting methods of interim financing for the railroads in reorganization methods which were likened by some pundits to pouring money into a bottomless pit. See, e. g., 121 Cong.Rec.H. 847 (daily ed. Feb. 19, 1975) (remarks of Representative Latta); 121 Cong.Rec.S. 1023 (daily ed. Jan. 28, 1975) (remarks by Senator Brock). Unless to do so would be unconstitutional, I believe that the RRRA requires this court to acquiesce in the Secretary's exercise of discretion and to order that the Penn Central and Jersey Central Trustees enter into unconditional agreements with the Secretary for the purchase of maturing equipment obligations.
 
 B
 
 62
 In granting the government only a conditional right to purchase maturing equipment obligations, the Penn Central reorganization court indicated its belief that such purchases would be the functional equivalent of a high-priority, interest-free loan that would defer further administration expenses (state and local taxes and leased-line rentals having been previously deferred), and in all probability work an unconstitutional erosion of the debtor estate. 400 F.Supp. at 925-26.
 
 
 63
 But this erosion will occur only if the maturing installments on the equipment obligations which are deferred are at some later point to be taxed against the debtor estate. Section 303(b)(3) of the RRRA, 45 U.S.C. § 743(b)(3), however, stipulates that ConRail is to assume any outstanding obligations for equipment conveyed to it under the Final System Plan:
 
 
 64
 Notwithstanding anything to the contrary contained in this Act, if railroad rolling stock is included in the rail properties to be conveyed, such conveyance may only be effected if the profitable railroad operating in the region or the Corporation to whom the conveyance is made assumes all of the obligations under any conditional sale agreement, equipment trust agreement, or lease in respect to such rolling stock and such conveyance is made subject thereto; and the provisions of this chapter shall not affect the title and interests of any lessor, equipment trust trustee, or conditional sale vendee or assignee under such conditional sale agreement, equipment trust agreement or lease under section 205(j) of Title II. (emphasis supplied).
 
 
 65
 At the very least, this provision must be read as substituting ConRail for the debtor as principal obligor under the conditional sales agreements. By assuming thence-forward the entire obligation ConRail would thus relieve the Trustees of their duty to repay USRA for monies expended in the purchase of the equipment obligations. Although liability on the obligations would carry forward as to ConRail, the direct liability of the debtor estate would be extinguished, and there would be no deferral of administration expenses that would contribute to the erosion of the estate.
 
 
 66
 The Trustees reply that even if the estate's primary liability on the obligations is extinguished, it may still be secondarily liable as surety of ConRail's performance, and that the threat of erosion persists. It is noteworthy, however, that nothing in § 303 or its legislative history suggests that after conveyance the debtor can be held secondarily accountable on the assumed obligation. It is certainly arguable that the debtor's liability is at that point wholly expunged by novation. Furthermore, counsel for the government in this case has stipulated that
 
 
 67
 "USRA and FRA are willing to agree that the Trustees would nevertheless be relieved of any responsibility with respect to the installments acquired by USRA, either as principal obligee (sic) or as surety for Conrail."
 
 
 68
 Reply Brief for United States in No. 75-1902 at 13. I question whether an Assistant Attorney General can bind the United States not to pursue a legal remedy against Penn Central, otherwise available to it, by a concession in this litigation. See In re Penn Central Transportation Co., supra, 384 F.Supp. at 939 n.90. Nevertheless, it is far from clear that a railroad in reorganization can legally be held accountable in the event of a ConRail defalcation, and even if it can, it is uncertain that any such liability would be enforced. Perhaps most significantly, it is almost inconceivable that ConRail would default on the payment of the assumed equipment obligations in the first place. These obligations are, after all, for rolling-stock, and as the majority points out, under § 77(j) of the Bankruptcy Act, 11 U.S.C. § 205(j), the title to rolling-stock sold on conditional sales agreements is unaffected by a railroad reorganization proceeding. It is highly improbable that ConRail would ever default on these obligations and risk repossession of essential equipment, even if the debtor estate is held as a surety.
 
 
 69
 Although I am unable to say with moral certainty that the purchase by USRA of maturing equipment obligations will not lead to a fifth amendment taking from the bankrupt estates, I do not believe that in this case the threat of erosion is sufficiently palpable to warrant judicial interference with the Secretary's exercise of discretion. And even if it is assumed that such an erosion would occur, I do not believe that creditors would go uncompensated for their loss.
 
 
 70
 As noted above, § 303(c) of the RRRA, 45 U.S.C. § 743(c), directs the Special Court, after all rail properties included in the Final System Plan have been conveyed, to determine whether the consideration paid to the conveying railroads is "fair and equitable" within the meaning of § 77 of the Bankruptcy Act, 11 U.S.C. § 205. At a minimum, the amount of compensation paid must satisfy the demands of the fifth amendment. If the Special Court determines that the consideration paid is inadequate, it can order ConRail to close the deficiency. § 303(c)(2) of the Act, 45 U.S.C. § 743(c)(2).
 
 
 71
 If the debtor estate has been subjected to an unconstitutional erosion prior to the time when the Special Court closes the books on the takeover, then that taking will be compensated for in the § 303(c) proceeding in the Special Court. If, however, the putative confiscation occurs after the Special Court has approved the terms of the ConRail takeover, then the debtor could still pursue a Tucker Act remedy in the Court of Claims. See Regional Rail Reorganization Act Cases, supra; In re Penn Central Transportation Co. (Special Court), supra. Although I do not expect that recourse to either of these remedies will be required, their very availability fortifies my conviction that the proposed action of the Secretary under review in this case is unfair neither to Penn Central nor to Jersey Central. Accordingly, I would reverse the judgment of the Penn Central Reorganization Court in No. 75-2151 to the extent that it permits the Trustees to repurchase equipment obligations acquired by USRA. I would affirm the judgment of the Jersey Central reorganization court.
 
 
 
 [1]
 See sections 213 and 215 of the 1973 Act, 45 U.S.C. §§ 723, 725, as amended by Pub.L. 94-5, approved February 28, 1975
 
 
 [2]
 The Federal Railroad Administrator is the delegate of the statutory authority and responsibility of the Secretary of Transportation for providing and administering federal financing needed to assure continuation of rail service pending the transfer of railroad property and operating responsibility to ConRail
 
 
 [3]
 In a subsequent Order No. 2100 the Court has permitted government purchases of installments becoming due in November, 1975, and thereafter, subject, however, to the trustees' right to repurchase before the ConRail takeover
 
 
 [4]
 The text of that agreement is set out in In the Matter of Penn Central Transportation Co., E.D.Pa.1974, 373 F.Supp. 185, 189
 
 
 [5]
 The reorganization court points out that it has been able to avoid deferral of administration expenses other than taxes and interline obligations
 
 
 [6]
 Since funds for section 215 financing come not from federal tax collections but from borrowings by United States Railway Association, and ConRail is required to assume these obligations, the risk to the general taxpayer, though real and a matter of proper concern, is only that of a guarantor
 
 
 [7]
 See section 304(f) of the Rail Act, 45 U.S.C. § 744(f)
 
 
 [8]
 April 1, 1976, appears to be the target date
 
 
 [1]
 In March, 1973, almost a full year before the 1975 amendments to the RRRA were adopted, the government petitioned Judge Fullam for an order directing the Penn Central Trustees to agree to the purchase of $10.8 million in maturing equipment obligations. The reorganization court granted the government's petition. In re Penn Central Transp. Co., 373 F.Supp. 185 (E.D.Pa.1974), appeal dismissed, 508 F.2d 270 (3d Cir. 1975). It is likely that this episode influenced Congress to make explicit the Secretary's authority to enter into, indeed insist upon, such agreements
 
 
 [2]
 The Senate Report accompanying the legislation said:
 Subsection (c)(1) requires the special court, in passing on the fairness and equity of conveyances by railroads in reorganization to the Corporation, to consider not merely the value of the securities received by the railroad but also the other benefits accruing to it as a result of the exchange, especially those benefits accruing to a railroad in reorganization by virtue of its reorganizing under the bill. Such benefit would include, for example, the value of the right to discontinue rail service and abandon rail properties pursuant to section 304 or receive a reasonable rate of return on any rail properties the continued operation which is maintained through a rail service continuation subsidy, the value of an expedited decision on the sale of rail properties to a profitable railroad operating in the region, the value of obtaining freedom from current contractual liabilities, and the value to the estate of each railroad in reorganization of having Government-financed employee protection and severance payments made (under title VI of the bill) to the employees of the railroad who would otherwise have claims against it for such payments.
 S.Rep.No.93-601, 93d Cong., 1st Sess., 1973 U.S.Code Cong. & Admin.News 3274-75 (emphasis supplied).